# CHARLESTON.

## PYLE *v.* HENDERSON.

Submitted January 10, 1908.   Decided January 26, 1909.

|    |     |
|----|-----|
| 65 | 39  |
| 65 | 599 |

1. MINES AND MINERALS—*Leases—Consideration.*

Though a lease for oil and gas, for a money bonus as consideration, does not bind the lessee to drill or pay money in lieu of doing so, but leaves it optional with him to do so or not, the lessor cannot annul or revoke it merely on the ground of want of *mutuality* of obligation.   (pp. 41, 42.)

2. SAME—*Forfeiture—Knowledge of Prior Lease.*

Where in an oil lease there is a clause that it shall be void if a well is not completed, or in lieu of it, money paid, within a given time, and before the expiration of the time it is found that the lessor's title is defective, and he agrees to perfect it, and agrees that the money need not be paid when due, and gives an extension for payment until the title can be perfected, he cannot declare a forfeiture and make a second lease. A second lease taken with notice of the first, is void as to the first lease.   (pp. 44, 45.)

3. SAME—*Leases—Forfeiture.*

In case of such a lease, if the lessor by his conduct clearly indicates, that payment will not be demanded when due, and thus lulls the lessee into a feeling of security and throws him off his guard, and because of this he does not make payments when due, the landlord cannot suddenly without demand or notice declare a forfeiture, and there is no forfeiture which equity would recognize, and, if there is in such case technically a forfeiture at law, equity would relieve against it.   (p. 45.)

4. SAME—*Oil Lease—Forfeiture—Waiver.*

A forfeiture will be deemed waived by any agreement, declaration, or course of action on the part of him who is benefitted by such forfeiture which leads the other party to believe that by conforming thereto, the forfeiture will not be incurred.   (p. 45.)

5. EQUITY—*Forfeitures.*

Courts of equity will not enforce a forfeiture of an estate.   (p. 45.)

6. SAME—*Dismissal—Effect Upon Answer.*

The dismissal of an original and amended bills does not carry with it an answer setting up facts calling for affirmative relief.   (p. 48.)

Appeal from Circuit Court, Tyler County.

Bill by C. E. Pyle and others against one Henderson and others. Decree for defendants and complainants appeal.

*Affirmed.*

PRICE, SMITH, SPILLMAN & CLAY, THOS. P. JACOBS, and W. S. MILLER, for appellants.

F. D. YOUNG, V. B. ARCHER, F. L. BLACKMARR, and WM. BEARD, for appellees.

BRANNON JUDGE:

Thomas Bunfill, 3d February, 1897, made an oil and gas lease of 60 acres of land to A. B. Campbell and J. W. Swan. The lessees paid Bunfill a cash bonus or consideration for the lease of fifty-five dollars. The lease is for a term of five years, and so long thereafter as oil and gas shall be found in paying quantities or rental paid thereon. The lease contained a clause on which this litigation turns. "Provided, however, that this lease shall *become null and void and all rights hereunder shall cease and determine* unless a well shall be completed on said premises within three months from the date hereof, or in lieu thereof thereafter the parties of the second part shall pay to the parties of the first part fifteen dollars for each three months' delay, payable in advance, until such well is completed." No well was put down under this lease, nor was the fifteen dollars commutation money paid. On 5th May, 1897, Bunfill made an oil and gas lease of the same tract to C. E. Pyle. The contest is between those claiming under these conflicting leases. When the first lease was made Bunfill owned only seven undivided ninths of the tract. His brother John owned one ninth, and the Sindledecker heirs the other ninth. Thomas Bunfill secured a conveyance from John Bunfill of his ninth, 15th March, 1897, before the three months limit in the clause quoted above had expired. He never did get in the ninth interest of the Sindledeckers. Some of them were infants, and under a judicial proceeding Miller, trustee, acquired that share of the oil and gas. Pyle, the second lessee, assigned an interest in his lease to Hardman, and Pyle and Hardman assigned the second lease to Miller, trustee, and thus Miller claimed the whole, except reserved royalties to Pyle and Hardman. The first lease came to be owned by Campbell, Swan, Stealy and Henderson. No possession was

taken under the first lease, but under the second wells were drilled and oil produced. Pyle, Hardman and Miller, trustee, claiming under the second lease, brought a chancery suit against Henderson and others, claiming in their original and amended bills under the second lease as superior to the right of those claiming under the first lease; claiming that all right under it had ceased before the second lease was made because of failure to drill a well or pay the fifteen dollars commutation money, as demanded by the clause of the first lease quoted above; alleging that they were in possession operating for oil under the second lease; and seeking to enjoin the claimants under the first lease from entering and boring for oil, and to cancel said first lease as a cloud upon their title. The defendants filed a cross-bill answer setting up their title under their first lease, and praying that the second lease be cancelled. A decree was entered holding the second lease void and cancelling it, and declaring the first lease good and valid, and dissolving an injunction which had been awarded against the claimants under the first lease entering or operating. The decree conceded to Miller his right to the Sindledecker share. From this decree Pyle and others appeal.

One argument made for the second lease is, that the first has no covenants binding the lessees to do anything, unless they wished; that it binds the lessees for nothing until they should get oil, either to drill a well or pay money; that the lessor could have no suit for money or to compel operations of development of oil. It is thence contended that the contract wants an essential of a binding contract, namely, mutuality. Under this view the lessor could renounce or revoke the lease at any time, because if not binding the lessee for anything, neither would it bind the lessor, and hence the second lease would be an election by Bunfill not to be bound, and would confer good title. For this contention we are cited the case of *Eclipse Oil Co. v. South Penn Co.,* 47 W. Va. 84, and *Glasgow* v. *Chartiers Oil Co.,* 152 Pa. 48. We differentiate the present case from the Eclipse case from the fact that no money was paid as a bonus in that case, whereas, one of fifty-five dollars was paid for the lease in this case. We cannot see that when a lessee pays a money consideration for the right or privilege of boring for oil within a fixed time, and in default of so doing or paying money as

an alternative, he has no vested right of exploration, but his privilege may be revoked at any moment, whether the limited time has expired or not. If that be the true view, the clause of cesser is needless, because a revocation could be made for want of mutuality only. It would seem to me that a lease of this character, the lessor receiving valuable consideration for the privilege of exploration for oil, would confer a valid right of exploration for the time and on the terms spoken in it. Such would seem to be the intent of the parties, and the justice of the matter, notwithstanding the contract imposed no obligation on the lessee to drill or pay. The lessor has been paid his price for giving such privilege. It seems that this was the construction of the *Eclipse Case* in the opinion by Judge McWhorter in *Harness* v. *Eastern Oil Co.*, on p. 250 of 49 W. Va. Denying the aptness in that case of the Eclipse case, he said, "In that case the lessee had paid nothing, had done nothing." In *Lowther Co.* v. *Guffey,* 52 W. Va. 88, Judge Dent, who prepared the opinion in the *Eclipse Case,* differed the two cases because of one dollar paid as a bonus. That lease imposed no obligation on the lessee. In *Tibbs* v. *Zirkle,* 55 W. Va. 49, a point held is, "An option given for a valuable consideration can not be revoked until the time limit therein has expired. If such option is without consideration, it may be withdrawn or revoked at any time before acceptance." So, we cannot say that from mere want of *mutuality* Bunfill could ignore the first lease.

The lessees under the first lease neither drilled a well within three months nor paid the money in place of it stipulated in that lease. For the second lease it is contended that such failure of itself caused the death of that lease; that it would work this result without any act on the part of the lessor declaring a forfeiture, even had the second lease not been made; that Bunfill could have remained quiet, done nothing to manifest an intent to insist upon the death of the lease, and it would have come to its end absolutely from such failure alone; that the "paper is self-destructive." It is said the document contains no words calling for an act declaring a forfeiture to end it. The contention for the first lease is, that an oil lease implies a warranty of good title, and that as Bunfill did not have the Sindledecker ninth, the title was not good, and work of development could not be safely done, and he could not insist on a forfeiture.

Counsel for the second lease say that there is no place for for-
feiture, as the first lease was at an end.  So much is this so
that the end of the lease, its death from want of compliance
with its terms, could not be waived, and that the second lease
could have no effect as a declaration or act of forfeiture; that the
land had been already freed from the first lease, without the
second lease; that nothing but a new lease to the first lessees
would do.  Those claiming under the first lease say that as Bun-
fill's title was defective, and as he agreed to an extension of time
for boring a well or paying money in its place, as below stated,
he could not enforce a forfeiture; that Bunfill was in no con-
dition to enforce a forfeiture.  The other side says that it cannot
be held that Bunfill was in no condition to declare a forfeiture,
as there was no forfeiture to be declared, because the lease was
dead.  This distinction is quite refined and unpractical.  What
if the instrument does not in terms provide for a forfeiture, or
contain the word?  What the plain meaning of the clause that
for failure to drill or pay money the lease "shall become null
and void and all rights thereunder shall cease and determine?"
The clause was put there for the benefit of the lessor.  Another
clause, one giving right to the lessee to surrender and be dis-
charged from liability, covered his case.  Surely the lessor could
waive this clause made for his protection.  It cannot be asserted
that there is anything in this clause as written preventing Bun-
fill from dispensing with it.  That a forfeiture may be waived
by the landlord in favor of a tenant is reasonable and clear from
cases cited in *Hukill* v. *Myers,* 36 W. Va. 639.  See *Roberts* v.
*Bettman,* 45 *Id.* 143.

The great question is, Was Bunfill, under the circumstances
of defective title, and waiver of forfeiture upon the facts to be
stated below, in a condition, on principles favored in equity, to
make the second lease and thus declare a forfeiture and devest
the right of the first lessees?  The circuit court's finding is,
that Bunfill was not.  This finding is upon much oral evidence
and conflicting, and we cannot reverse, unless we can say that
such finding is plainly wrong.  We cannot say so.  That Bun-
fill's title was bad no one disputes, and he himself admitted it.
He did not disclose its defects to the first lessees, but represented
to them that it was good, and leased the whole tract.  Some time
after the first lease was made, before the three months had gone,

Campbell and Swan went to Bunfill and told him of the fact that he did not own two ninths of the tract. He confessed the fact. They told him he must secure them. He agreed to do so. He made two trips to Ohio to get in these two ninths at their request. He agreed to hunt up the Sindledecker heirs and secure in some way their interest. The lessees furnished him money to pay traveling expenses and purchase. He went to Wellsville Ohio to get information of them. He learned that they resided, some in Taylor county, others in Cumberland. On his return from Wellsville he informed his lessees where they were to be found, and it was agreed between him and Campbell and Swan that Campbell and Swan should go to those heirs and arrange for securing their title, and Compbell went, and while absent on this mission Bunfill made the second lease, without notice to his first lessees. It was distinctly agreed that Bunfill should, at his expense, procure this outstanding right, and that the cost should go to the credit of the lessees on the money payable under the lease in commutation of drilling. The lessees contributed to get a deed from John Bunfill for his interest. All this is inconsistent with the idea that Bunfill intended to rely on the strict letter of the forfeiture clause. Perhaps, if he had not agreed to get in the title, and joined with his lessees to do so, and undertaken efforts to do so, and agreed to credit the cost on the rental, his second lease would be good; perhaps mere badness of title would not have stayed the lapse of the lease; but when we reflect that the title was bad, and that Bunfill admitted it to be bad, and agreed to join in the effort to perfect it, and agreed that the cost should go on the commutation money, and the amount of the expenditure not being known, and no time being limited to Campbell and Swan to carry out the right given them to get in the Sindledecker share, and the Sindledecker heirs being infants, necessitating resort to court proceedings, and as these lessees were actually going on to secure this interest within reasonable time, we must conclude that Bunfill thus dispensed with payment of the fifteen dollars payable at the close of the three months, and thus waived the forfeiture, and extended the time. "Where in an oil lease there is a clause of forfeiture for non-payment of rental, but the lessor consents that it need not be paid at the times when due and indulges the lessee and acquiesces in his failure to pay, there is no forfeiture for

non-payment." "In case of such a lease, if the lessor by his conduct clearly indicates, that payments will not be demanded when due, and thus lulls the lessee into a feeling of security and throws him off his guard, and because of this he does not make payments when due, the landlord cannot suddenly without demand or notice declare a forfeiture, and there is no forfeiture, and there is no forfeiture which equity would recognize, and, if there is in such case technically a forfeiture at law, equity would relieve against it." *Hukill* v. *Myers,* 36 W. Va. 639. "A forfeiture will be deemed waived by any agreement, declaration or course of action on the part of him who is benefitted by such forfeiture, which leads the other party to believe that by conforming thereto the forfeiture will not be incurred." *Hudson* v. *N. Pacific Ry. Co.,* 54 Am. St. R. 550. And we must not forget that this case is in a court of equity, which frowns upon forfeitures as heavy and harsh, and will never enforce them, but will generally relieve against them. This suit is to enforce a forfeiture. It must do so, if relief is granted the second over the first lease. *Spies* v. *Avondale,* 55 S. E. 464; *South Penn Co.* v. *Edgell,* 48 W. Va. 348; *Wheeling etc. R. Co.* v. *Triadelphia,* 58 *Id.* 487; *Pheasant* v. *Hanna,* 60 S. E. 618. A full discussion of this subject is in 8 Am. & Eng. Dec. in Eq. 180 and notes. We find there the following: "A court of equity will leave to his remedy at law—will refuse to interfere to grant any relief to—one who, in the matter or transaction concerning which he seeks its aid, has been guilty of bad faith, unrighteous dealing, or unconscionable acts." "Courts of equity will not entertain bills to enforce forfeitures, but will leave the parties to their remedies at law."

It is contended that the lessees under the first lease could have drilled for oil by right of being cotenants of the Sindledecker heirs, and were bound to do so. It would be waste by law and a wrong, by our statute, Code 1899, chapter 92, section 2. 30 Am. & Eng. Ency. L. (2d Ed.) 265. It has several times been held in this state that one tenant in common cannot commit waste by extracting oil. *Williamson* v. *Jones,* 43 W. Va. 562; *Cecil* v. *Clark,* 49 *Id.* p. 470, and 47 *Id.* 402. Chancellor Kent held that injunction will go to stay waste "between tenants in common, where the waste is destructive to the estate and not within the usual and legitimate exercise of the enjoyment."

*Hawley* v. *Clowes,* 2 Johns. Chy. 122. It changes the whole character of the inheritance. The Sindledeckers owned the *corpus* in fee. They could sue or enjoin for waste. In the *Williamson Case* Jones had interests in the *corpus,* and it was held he could not take oil. High Inj., sec. 692. As a principle of law, applicable in cases in general, I am reluctant to say that in every case an injunction will lie for one tenant against his cotenant cutting timber, taking coal or oil. The authorities are divided. But we must remember that we have that statute. In some cases he may be required to resort to an action for his share. But there is high authority for the proposition. 5 Pomeroy's Eq., in Vol. 1 of Equitable Rem., sec. 492, says: "It was formerly thought that, because of the nature of their legal rights, an injunction would not issue between tenants in common for any ordinary act of waste either legal or equitable, but that acts of waste so destructive as to go beyond the requisites of either of these might be enjoined. But the cases show that the exercise of equity jurisdiction is now more liberal, and any acts of waste by one tenant in common that are inconsistent with prudent management of the estate or that jeopardize the interest of his co-tenant will be enjoined." Pomeroy cites *Hawley* v. *Clowes,* above, *Wood* v. *Early,* 95 Va. 307, and many other cases. And, even if the lessees might have drilled, were they bound to do so, and subject themselves to an action for account for the share of the Sindledecker heirs? Likely owners of a mine, or lease to mine, one may mine. That is the nature of the property; but in this case the lessees had an oil lease good only for a part of the estate. The Sindledeckers owned the *corpus* of the ninth. These lessees and they were not cotenants, so as to give the lessees right to take oil. They did not hold with Campbell and Swan a joint estate *under the lease.* One cotenant can not make a lease binding another. Could not the Sindledeckers have enjoined the first lessees from drilling? In this connection it is argued that the majority may control, and therefore the lessees having a lease from the owner of a majority of the undivided interests, could drill. They are said to be a mining partnership, subject to the control of a majority. That is so, where the work has been entered upon. But this is not a case of a mining partnership. Were the lessees under the first lease mining partners with the Sindeldeckers? They were not in

any sense. But I ask what if the first lessees could have entered? How does this question materialize in view of the fact that Bunfill dispensed with drilling or paying, extended the .time, until the Sindeldecker right should be procured? When Pyle took the second lease he had full knowledge of the first lease, and solicited Bunfill to lease to him. A court of equity cannot look with much favor on his suit to enforce a forfeiture to his benefit. When this second lease was taken the term of the first lease, five years, had not expired. If it had, there would be some force in saying that it could be extended only by a new lease; but such was not the case. It was then competent for Bunfill to waive the mere forfeiture, the first lease being still in life, from want of title and waiver of payment by Bunfill, it was the binding duty of Pyle to learn, by inquiry from the first lessees, as to the right they claimed and how they claimed, and we may say that he would have learned that Bunfill had agreed to procure good title for the benefit of the first lessees, and had waived the forfeiture. Knowledge of the first lease put Pyle on inquiry, and he is affected with notice of the right of the first lessees and the waiver of the forfeiture. Authorities for this proposition are given in *Reed* v. *Bachman,* 61 W. Va. at page 464. Pyle was thus, under the law, guilty of gross negligence, to say the least.

It is said that when Campbell and Swan took the first lease they knew of the outstanding titles. They deny it. Perhaps they had constructive notice. What if they had actual notice? They had a warranty against it, since an oil lease implies a warranty for quiet enjoyment. *Headley* v. *Hoopengarner,* 55 S. E. 744, (60 W. Va. 626). If a man have knowledge of a lien or defect of title, yet takes a general warranty, he can rely on the warranty.

Another point made for the second lease is, that a tenant cannot, while in possession, attack his landlord's title, but must give up possession before he can do so. This rule has no application in this case. Campbell and Swan never took possession. There was no possession to give up. A tenant in possession cannot defeat his landlord's title, and disavow the tenancy, by setting up a hostile title; but this principle is not fitted to this case. The lessees do not say that their landlord's title is bad as to those interests which he owned. They only say that he leased *all* the tract, as if no other person had an interest, when in fact

another had such interest. This is a case between landlord and tenant growing out of the relation *under the lease.* A tenant is not bound to pay rent when he gets bad, defective title. It involves the question, as to this point, whether when the landlord's title is defective, the tenant shall forfeit his right by failure to drill or pay rental.

Again, it is said there was no eviction of the lessees. There was no possession by the first lessees. Eviction, then, is out of the question. But it is said that as there was no possession and no eviction, it thence follows that the only remedy for those lessees is an action at law for the breach of the warranty implied from the lease. Would not want of possession and eviction defeat it? In such an action eviction would be material, but not in this case. The question here is. Is the lease gone by reason of failure to drill or pay rental? Is it forfeited in a court of equity? Granting that it would be at law, will not a court of equity say that want of title disabling the lessee from operating, coupled with agreement and conduct of Bunfill to dispense with drilling and paying according to the strict letter of the lease, saves the first lease?

It is assigned for error that the court dismissed the original and amended bills, when incontestably the plaintiffs owned the Sindledecker ninth interest undivided in the tract. The decree adjudicates and declares precisely the interests of those claiming under the first lease and of those claiming under the second, giving to the plaintiffs their full share or interst in the oil and gas as assignees of the Sindledecker heirs' interest in the oil and gas. The dismissal does not aggrieve the plaintiffs. The decree is final as to these rights of the parties. A reference was made to ascertain what oil had been taken from the land by Miller. Further decree as to the matters involved in the reference could be based on the cross-bill answer, as it is a complete bill for that purpose, not depending on the dismissed bills. The dismissal of the other bills does not, as suggested with hesitation by counsel, operate to dismiss said answer. *Spies* v. *Avondale, 55* S. E. 464 (*60* W. Va. *389*), does not support this suggestion. It holds that the dismissal of the original bill carries a crossbill where its subject matter is *only defensive* of the original bill. Such is not this case. This answer is as full as a bill, and calls for affirmative relief by way of cancellation of the second lease

for causes stated in the answer, and for an account of oil pro-
duced, and other matters. The dismissed bills sought cancella-
tion of one lease, the answer sought cancellation of another.
Different objects. The answer is by no means purely defensive.
It is a complete cross-bill for relief, as much so as an original
bill. When a cross-bill, or an answer treated as such under our
statute, is not merely defensive, but states facts and calls for
affirmative relief, the dismissal of the original bill does not dis-
miss the answer. Hogg's Eq. Proced., sec. 205, citing *Pethtel* v.
*McCullough,* 49 W. Va. 520; *Ragland* v. *Broadnax,* 29 Grat.
401.

Our conclusion is to affirm the decree of the circuit court.

*Affirmed.*