# CHARLESTON.

## McGRAW OIL COMPANY *v.* KENNEDY.

Submitted January 19, 1909.   Decided April 27, 1909.

1. MINES AND MINERALS—*Leases—Forfeiture.*

    A lease for oil and gas is for five years "and as long thereafter as oil or gas, or either of them, is produced by the party of the second part." The lessor cannot forfeit it because he thinks the gas not in paying quantity, the lessee claiming that it is, and willing to pay the sum stipulated for the well. It is for the lessee to say whether the gas is in paying quantity, acting in good faith. (p. 598.)

2. SAME—*Leases—Forfeiture—Failure to Market Gas.*

    When a producing gas well is developed, but its product not marketed, that fact does not authorize the lessor to forfeit the lease, the lessee being willing to pay the agreed sum for a gas well. (p. 600.)

3. SAME—*Leases—Forfeiture—Failure to Drill Additional Wells.*

    An oil and gas lease cannot be canceled in equity only for failure to drill additional wells. (p. 600.)

4. SAME—*Leases—Estates Created.*        •
    Under the lease in this case a well producing gas is drilled, and the lessee elects to consider it in paying quantity, an estate had thus vested in him. (p. 601.)

Appeal from Circuit Court, Taylor County.

The McGraw Oil & Gas Company filed a bill against R. W. Kennedy and the Crystal Ice Company, and thereafter Kennedy and the ice company filed a bill against the McGraw Oil & Gas Company, the South Penn Oil Company, and another. The cases were heard together and from the decree the Crystal Ice Company, Kennedy, and the South Penn Oil Company appeal.

*Reversed and Remanded.*

DAVIS & DAVIS, A. B. FLEMING, CHAS. POWELL, KEMBLE WHITE, and B. F. BAILEY, for appellants.

DENT & DENT, for appellees.

BRANNON, JUDGE:

Hugh Evans, on 20th September, 1899, leased a tract of 528 acres of land in Taylor county to U. S. Ditman and J. C. Gawthrop for production of oil and gas. The lease provided that Evans have free of charge gas for use in his residence. The lease to continue for the term of five years "and so long thereafter as oil or gas, or either of them, is produced therefrom by the party of the second part, heirs, executors, adminstrators or assigns." The lease deed provided that the lessee deliver into pipe line to the credit of Evans one eighth of oil produced and pay two hundred dollars yearly for "each gas well the product from which is marketed and used off the premises." The lease provided that the lessees drill a well within twelve months or pay thereafter one hundred and thirty-two dollars quarterly until one should be drilled. No well having been drilled within twelve months, the sum of one hundred and thirty-two dollars was paid Evans, extending the lease to 20th December, 1900. Before the 20th December the Southern Oil Company under some agreement with Ditman and Gawthorp drilled a well and produced gas in December 1900. The casing was drawn from the well and the well prepared for use by the insertion of a wallpacker and 1,400 feet of tubing, and a cap at the top, with a gate through which the gas could be removed. This was done to save all gas. Tests of the gas produced in the well were made

at various times, the tests varying in quantity from 331,700 to 1,140,500 cubic feet. No gas from the well was marketed, but it was closed so as to save the gas from waste. The Southern Oil Company sold its interest in the well to the South Penn Oil Company and then Ditman and Gawthrop assigned the lease to the South Penn Oil Company. Later the South Penn Company assigned the estate in the gas to the Hope Natural Gas Company, reserving the estate in the oil. Later the Hope Natural Gas Company assigned the gas right to R. W. Kennedy to hold in trust for the Crystal Ice Company, a corporation engaged in manufacturing ice in the city of Grafton. The well was bought to give fuel to this and other plants, and a franchise from Taylor county and Grafton to lay pipes from the well to the plant was obtained by the ice company. This was under the authority of the directors of the ice company, and the purchase money was paid out of its treasury. The well was in "wild cat territory." There was no pipe line near it. When the well was drilled Evans, the lessor, piped gas from it to his residence and has ever since used the gas for his domestic purposes. He received one hundred and thirty-two dollars for failure to drill the first year, and after the well was drilled he received seven payments of two hundred dollars each, the annual payments stipulated for each gas well. He was tendered the two hundred dollars for the year ending 20th December, 1907, but refused to receive it. On 20th March, 1907, Evans leased the same tract to the McGraw Oil & Gas Company. The latter company had full notice of the first lease, when it leased, and notice was served on it by Kennedy of his claim of title, and warning the McGraw Oil & Gas Company and John T. McGraw not to go on the premises, and warning them that if they should produce oil or gas on the land Kennedy would claim for the same. Notwithstanding this notice the McGraw Company entered and drilled a well producing gas. The McGraw Company brought a chancery suit against Kennedy and the Crystal Ice Company to declare the lease made by Evans to Ditman and Gawthrop forfeited and cancel it as a cloud upon its title under the second lease. Later Kennedy and the Crystal Ice Company brought a chancery suit against the McGraw Oil & Gas Company, the South Penn Company and Evans setting up the first lease, that from Evans to Ditman and Gawthrop, claiming under it title para-

mount to that conferred by the second lease, that from Evans to the McGraw Oil & Gas Company, and to cancel the latter lease as a cloud upon the title conferred by the first lease, and to make the McGraw Company responsible for gas taken from the premises.   The South Penn Company filed in the case of the Crystal Ice Company an answer, containing also cross-bill matter against the McGraw Company, Evans and others, seeking to have declared void as to the first lease the lease from Evans to the McGraw Company.   The cases were heard together, and a decree was pronounced, sustaining a demurrer to the cross-bill of the South Penn Company, and dismissing the bill filed by Kennedy and the Crystal Ice Company, and cancelling the right of Kennedy and the Crystal Ice Company and enjoining them from asserting any right against the McGraw Company and from doing anything to interfere with or prevent the McGraw Company from developing and using the land for gas.   The Crystal Ice Company, Kennedy and the South Penn Oil Company appeal.

It cannot be said that the first lease is forfeited by any express forfeiture clause found in it.   The theory of the McGraw Company is, that such a lease confers no vested estate in oil or gas in the earth, but at most confers only a right to search for oil and gas, and that only when oil or gas shall be found in paying quantity and marketed does any estate vest in the lessee, and that no estate ever vested under the first lease, because the gas found was not in paying quantity.   This lease does not limit its term by requiring that oil or gas shall be found in paying quantity, as leases usually do.   It says that the lease shall endure "five years from this date and as long thereafter as oil and gas, or either of them, is produced therefrom by the party of the second part."   So, this lease contains nothing in terms allowing the lessor to end it because oil or gas is not found in paying quantity.   And if there were such provision, I should regard it as made in the interest of the lessee to protect him from payment of the annual sum for a gas well, if insufficient in quantity, and not as intended to give the lessor right to terminate the lease against the lessee's will, he treating the quantity as sufficient and electing to pay.   What right has Evans to say that no estate vested by reason of insufficiency of gas, when the lease makes no such provision, and the lessee chooses to regard it as sufficient and pay as if it were?   And again it has been held, even

when such a clause is in the lease, that it is with the lessee to say whether the product is in paying quantity. *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501; Thornton, Petroleum & Gas, sec. 119. So held in *Summerville* v. *Apollo Co.,* 207 Pa. St. 334, and by Judge Goff in *Kellar* v. *Craig,* 126 Fed. R. 630. *Young* v. *Oil Co.,* 194 Pa. St. is notable for this construction of such a clause. It says that the operator has election to say whether it will pay. It is useless to argue that a lease does not vest right to oil and gas in place, and therefore no right vests of any character, if the quantity is too small to pay. No one says that the lease carries title to these minerals, even after a paying well has revealed them; but an estate, a right of value then vests, that is, right to retain possession of the land for operation and to go on to sever the minerals from the land and convert them into personalty. When this well was found the lessee had right, if he chose, to keep possession and pay the annual rental; he had a vested right. Evans was only entitled to the rental. Title vested. He gets the same pay as if the well produced a larger quantity. There is really no evidence that it was not a paying well. The cross-bill alleges that it was and this is to be taken as true on demurrer. Evans for seven years so treated it; for he received seven annuals of two hundred dollars knowing that the gas was not being marketed, knowing the status of the well. Though the gas was not marketed, the well was being used to comply with the lessee's covenant to furnish Evans gas for his use. The law is that "the right to declare a forfeiture must be distinctly reserved, proof of the happening of the event on which the right is to be exercised must be clear, and the party entitled to do so must exercise his right promptly." *Thompson* v. *Christie,* (Pa.) 11 L. R. A. 236. Will equity allow Evans to wait and wait, drawing large sums of money yearly, and then at the eleventh hour suddenly forfeit? Is he not estopped? Such acceptance of money by Evans, knowing all the facts, is forcible against him as an estoppel in a court of equity. *Hukill* v. *Myers,* 36 W. Va. 639. As to the suit by the McGraw Company. It is, virtually, really, a suit in equity to enforce a forfeiture. Equity will not take affirmative, active steps to enforce a forfeiture. *Pheasant* v. *Hanna,* 63 W. Va. 613, where the subject is discussed by Judge Poffenbarger. So held in *Pyle* v. *Henderson,* 65 W. Va. 39 (63 S. E. 762). That clause in the lease by

which the lessees were to pay ·two hundred dollars yearly for each gas well "the product from which is marketed and used off the premises" was designed to protect the lessee from demand unless he marketed the gas.  It is not a stipulation to market or give up.  That is for the lessee's protection, and that has been waived and royalty paid.  Moreover, there. is evidence going to show that the gas was, in fact, in paying quantity.

Title having vested, the lease contains no clause that forfeits it.  It is argued not definitely, but virtually, that failure to drill other wells forfeits.  We have frequently held that where there is no express provision requiring additional wells, but only an implied one, this will not forfeit.  *Core* v. *Petroleum Co.,* 52 W. Va. 276; *Kellar* v. *Craig,* 126 Fed. R. 630.  I have never been reconciled to the doctrine that for failure to drill additional wells the lessor must sue at law for damages, and equity will not cancel unless for draining from near by territory and thus exhaust oil in the leasehold involved.  I have asked, How many actions must the landlord bring?  How can damages be measured?  How can we see into the depth of the earth?  But it has been so held.  The reason .is, that equity will not, as a rule, enforce a forfeiture of an estate.  It will not especially insert such a claues when the parties have not inserted it, especially when they did insert forfeiture for failure to drill or pay commutation, but did not insert forfeiture for failure to drill additional wells.  As to duty to drill additional wells for gas, the Pennsylvania supreme court has held, practically, that it does not exist in gas as in case of oil, because of the difference.  A small oil well can be used; a gas well of slight pressure will not enter the gas line.  *McKnight* v. *Manufacturers Gas Co.,* 146 Pa. St. 185 (28 Am. St. R. 790).  That was for both oil and gas, but development seemed to show the section to be gas territory, as in this case.  But we express no opinion as to this.  We only say there can be no forfeiture for mere failure to drill more wells.

It is argued that failure to market the gas forfeits the lease.  So it was claimed in *Summerville* v. *Apollo Gas Co.,* 207 Pa. St. 334, as to a lease for two years "and as much longer as oil and gas are found in paying quantities," and the court said that the lessor had no right to forfeit at the end of two years because during that time no oil or gas had been marketed.  "It may be

that for some time the lessee was not able to find a purchaser for the gas, but that was not the affair of the lessors; they were not interested in the proceeds of the sale of the gas. Their rights under the agreement extended only to the receipt of a stipulated annual rental for each well and the free use of gas for domestic purposes. Beyond this, the question of whether or not the quantity of gas was profitable, was for the decision of the lessee. It may be that the final disposition of the product of the well was such as to amply remunerate it for the delay in finding a market." There is no evidence that the well was not in paying volume.

Is it claimed that the well and lease have been abandoned? As said in *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 506, "The loss of property by abandonment is not easily shown nor readily held by the courts." "To constitute abandonment by the lessee of a lease for oil there must be both an intention to abandon, and actual relinquishment of the leased premises." *Sull* v. *Hochstetter,* 63 W. Va. 317, says the tenant must quit and the landlord taken possession to work abandonment. Abandonment is not only not established, but plainly negatived in this case. The lessees paid and Evans received for seven years the rental money for the well. The lessees tendered for the year 1907. The leasehold was assessed with taxes to Kennedy. The lessee put in the well 1,500 feet of tubing, wall packer and casing head. The lease was at different times conveyed from one to another as an existing lease. The Grafton Ice Company in December 1904 paid one thousand dollars for the lease, and made preparation to pipe the gas from the well to Grafton to its ice manufactory. They have cared for the well, blown and tested it, and never been out of possession, nor has Evans ever tried to expel that company from his premises. He says he never hindered it from going on the premises to attend to the well, and that "they always had that right."

Therefore, we reverse the decree, and dismiss the bill filed by the McGraw Company, and we decree that the lease in the record specified dated 20th day of March, 1907, from Hugh Evans and wife to the McGraw Oil & Gas Company be canceled, annulled and set aside as to the rights of the Crystal Ice Company, Robert M. Kennedy, the South Penn Oil Company and all other parties having rights derived under and by virtue of the

lease in the record specified, dated 20th day of September, 1899, made by Hugh Evans and wife to U. S. Ditman and J. C. Gawthrop. And this cause is remanded to the circuit court of Taylor county for further proceedings.

*Reversed and Remanded.*