**WEST v. COMMISSIONER OF INTERNAL REVENUE (three cases).**

**WEST'S ESTATE et al. v. SAME.**

**Nos. 11178-11181.**

Circuit Court of Appeals, Fifth Circuit.

July 24, 1945.

Rehearing Denied Sept. 18, 1945.

---

Randolph E. Paul, of Washington, D. C., and James H. Yeatman, of Houston, Tex., for petitioners.

Bernard Chertcoff, Sewall Key, and Helen R. Carloss, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before HOLMES, McCORD, and LEE, Circuit Judges.

HOLMES, Circuit Judge.

These consolidated proceedings involve income-tax deficiencies for the year 1938. By deed the petitioners transferred to the Humble Oil & Refining Company certain lands, improvements thereon, and minerals therein, subject to the terms of a contemporaneous collateral agreement. The Tax Court held that the profit from the sale of the surface of the land and improvements was a capital gain, but that such part of the consideration as was attributable to the mineral rights represented a bonus or advance royalties.

■ There is no question here with respect to the surface of the land or the improvements, or as to the proper method of taxing the gain from the surface estate. It is well settled in Texas that the surface of realty may be severed and held separately from the title to the minerals.[1] The only issue now presented is whether, for tax purposes, the transaction constituted a sale or a lease of the minerals, it being wholly neither, but having attributes of both; if a sale, then the cash so received was taxable under the capital-gains provision of the Revenue Act of 1938, Sec. 117, 26 U.S. C.A. Int.Rev.Acts, page 1061; if a lease, then such cash was taxable as depletable income under Section 22(a) and 23(m) of said act, 26 U.S.C.A. Int.Rev.Acts, pages 1008, 1014.

■ In determining the character of the contract, we are dealing with a deed and a contemporaneous written agreement. We may look not only to the language employed in both instruments, but to the circumstances surrounding the parties when the instruments were executed.[2] Prior to that time, J. M. West told Humble that he wanted to sell the properties. Humble was interested in the right to develop the lands for oil and gas; that was its business. It negotiated with West to acquire the properties for that purpose. Humble's complete lack of interest in the surface was demonstrated by its leasing of the land to West for grazing and agricultural purposes. All this was shown by the evidence and found by the Tax Court.

[1] Harris v. Currie, 142 Tex. 93, 176 S.W.2d 302.

[2] Scott v. United States, 12 Wall. 443, 20 L.Ed. 438; United States v. Peck, 102 U.S. 64, 26 L.Ed. 46; Merriam v. United States, 107 U.S. 437, 2 S.Ct. 536, 27 L.Ed. 531; United States v. Gibbons, 109 U.S. 200, 3 S.Ct. 117, 27 L.Ed. 906; Sand Filtration Corporation v. Cowardin, 213 U.S. 360, 29 S.Ct. 509, 53 L.Ed. 833.

Under the terms of the deed and agreement, the parties did not undertake to convey the entire interest of the grantors in the minerals. The granting, habendum, and general warranty clauses contained words of limitation excepting from the conveyance and retaining in the grantors specific mineral rights amounting in some instances to three-eighths thereof. The only language in the instruments that specifically referred to mineral interests acquired thereunder provided that Humble should be entitled to the conveyed percentage of all oil, gas, and other minerals produced from the property after seven o'clock a. m., December 28, 1938. On the date of the deed a division order was executed in which the parties certified that Humble was the owner of a five-eighths interest and West a three-eighths interest in all oil produced from the tract therein described. Similar division orders, where the interests varied, were executed by the parties covering other productive portions of the land involved. The situation here is distinguishable from Helvering v. Elbe Oil Land Company, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, where the contract provided for the absolute sale of all the property, including the oil and gas in place, without the retention by the taxpayer of any interest therein.

The Tax Court held that, from a practical standpoint, the provisions of the agreement weighed heavily in favor of a leasing arrangement; that one could not examine the terms of the agreement without realizing that its main purpose was to secure to the grantors the three-eighths royalty interest specifically excepted from the conveyance; that without operation of the properties they would receive no return on their interests; that, in order to be assured of a return, the grantors bound the grantee, an operating company, to operate with reasonable diligence not less than four drilling rigs, to drill offset wells, and to drill certain deep-test wells. It was further agreed that petitioners would sell and Humble would buy all royalty oil; that division orders would be executed and delivered; that the provision for free fuel for operating did not extend to certain leases owned by Humble; that an oil well meant a well capable of producing oil in paying quanti-

ties; that the royalty and overriding royalty provisions should be applied in a certain manner where a particular sand in a certain field varied with respect to the 7500-foot depth; that petitioners had the right to be represented when gauges were made, and the right to be furnished with copies of the logs of wells drilled or being drilled. Also there were other provisions usually found in mineral leases.

The Tax Court decided that there were factors favoring the petitioners' contention, but that they did not predominate; that the presence of so many provisions usually occurring in oil and gas leases supported the contention that the transaction in substance amounted to a lease of the minerals notwithstanding there was a sale of the balance of the land. We are in accord with this view. The absence from the deed and agreement of the words lease, let, lessor, and lessee, is not controlling. In the field of taxation we are concerned with realities, not formalities. The descriptive terminology that may be used in deeds, contracts, or other written instruments is ineffective to restrict the scope of the income-tax law. Technical niceties of the local law are not allowed to obscure the basic issue as to whether cash received is taxable under the capital-gains or the depletable-income provisions of the income-tax law.

The absence of a forfeiture clause has no special significance in the prevailing circumstances. The Wests relied upon their contractual right to recover damages for the failure of Humble to perform its drilling and other obligations, and probably upon the remedy of specific performance.[3] The differences between the nature of the title that Humble took and what an ordinary lessee would have taken are immaterial for federal-income-tax purposes.[4] The question for decision here does not turn upon recondite distinctions in the local law between determinable and indefeasible fees.[5] The purpose of the transaction was the production of oil; and, to that end, the Wests retained the legal title to an undivided interest in the oil in place and contemporaneously stipulated for an income-producing operation "resembling a manufac-

3 3 Summers Oil & Gas, Perm.Ed., 1927, § 462.

4 Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489.

5 Cf. United States v. Joliet & Chi-

cago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, dealing with a so-called lease in perpetuity without a defeasance clause, which vested a full and indefeasible title in the grantee.

turing business carried on by the use of the soil."[6] These factors predominated to such an extent that the fact-finding tribunal held the transaction more nearly to resemble a lease than a sale. In Hogan v. Commissioner,[7] the conveyance used the words "do hereby bargain, sell, assign and convey," but this court held that the assignment, for tax purposes, was deemed a sublease rather than a sale, thereby disregarding technical distinctions of local law and applying uniformly the federal-income-tax statutes.[8]

■ In other words, the fact that the instruments of transfer passed only a fractional mineral interest, retaining the remaining portion thereof, is not controlling in determining the legal relationship created between the parties. It must also be considered that the properties conveyed were in part actual and in part probable producers of oil; that the transferee was engaged in the oil business, and was interested in the properties only for the purpose of developing the minerals; that one of the objects of the transferors was to secure full development of the minerals; that the transferee was contractually obligated to develop; and that the transferors, though securing to themselves so valuable a covenant, were chargeable with no part of the costs thereof.

■ What these taxpayers seek as liberal to them might prove harsh to others. The policy considerations underlying the capital-gains provision of the tax laws have no greater force than the considerations that underlie the depletion provision. The latter was intended as a tax-free return of the capital consumed in the production of gross income through severance.[9] The depletion allowance was intended to encourage production, and may be regarded as a substitute for the capital-gains allowance where the taxpayer, instead of selling, leases or operates his own mineral holdings. The Tax Court is not a policy-making body; it is an administrative tribunal with quasi-judicial functions.[10] It considers both law and facts, but review of its decisions is limited to questions of law.[11] As an independent agency in the executive branch of the Government, it differs from the old Court of Exchequer in England in that the latter was a judicial court of law and equity with exclusive jurisdiction in fiscal matters.[12]

■ All that has been said by the Supreme Court as to the finality of administrative determinations in other fields is applicable to decisions of the Tax Court.[13] The judicial function is exhausted when, upon review, there is found to be a rational basis for its decisions; but its mistakes of law, clear-cut or rough-hewed, may be corrected on review.[14] A rational basis for decision consists of a permissible finding of fact and a correct application of the law.[15] A decision on any other basis is not in accordance with law and is sub-

---

[6] Anderson v. Helvering, 310 U.S. 404, pages 407, 408, 60 S.Ct. 952, 954, 84 L. Ed. 1277, wherein the court said: "Oil and gas reserves like other minerals in place, are recognized as wasting assets. The production of oil and gas, like the mining of ore, is treated as an income-producing operation, not as a conversion of capital investment as upon a sale, and is said to resemble a manufacturing business carried on by the use of the soil. * * * By an outright sale of his interest for cash, such an owner converts the form of his capital investment, severs his connection with the production of oil and gas and the income derived from production, and thus renders inapplicable to his situation the reasons for the depletion allowance."

[7] 5 Cir., 141 F.2d 92, 93.

[8] In Hervey v. R. I. Locomotive Works, 93 U.S. 664, 23 L.Ed. 1003, a contract in the form of a lease was held to be a sale. The court said, page 672 of 93 U.S., 23 L.Ed. 1003: "Nor is the transaction changed by the agreement assuming the form of a lease. In determining the real character of a contract, courts will always look to its purpose, rather than to the name given to it by the parties."

[9] Anderson v. Helvering, 310 U.S. 404, 408, 60 S.Ct. 952, 84 L.Ed. 1277.

[10] Hutchings-Sealy Nat. Bank v. Commissioner, 5 Cir., 141 F.2d 422; 26 U.S. C.A. Int.Rev.Code, § 1100, 56 Stat. 957, 53 Stat. 158 et seq.

[11] 26 U.S.C.A. Int.Rev.Code, § 1141(c) (1).

[12] 15 C.J. p. 688; 3 Bla.Com. 44, 45.

[13] Dobson v. Commissioner, 320 U.S. 489, 501, 64 S.Ct. 239, 88 L.Ed. 248, rehearing denied 321 U.S. 231, 64 S.Ct. 495, 88 L.Ed. 691.

[14] Bingham's Trust v. Commissioner, 65 S.Ct. 1232.

[15] "In general, it is the function of the Board [the Tax Court] to determine the facts of a tax controversy on issues raised before it and to apply the law to those facts; and it is the function of the reviewing court to decide

ject to modification or reversal on review.[16]

■■■■ Every tax decision is controlled by some principle of law, which arises out of the facts.[17] The principle may be a part of the common law, or it may be defined in a statute, regulation, or constitutional provision. The rightfulness of the decision may depend upon the correct interpretation or the proper application of the governing principle. Often a question of law is presented as to whether there is substantial evidence to support the findings of fact. Jurisdiction to review decisions of the Tax Court is conferred by statute and is not affected by the difficulties of distinguishing between legal and factual issues, but the decision under review must be affirmed if an error of law therein is not discernible from the record.[18] The limitation upon the scope of the review is jurisdictional.[19]

In the instant case, the rational basis for the decision was substantial evidence in the record to support the finding of the Tax Court that the transaction amounted to a lease of the minerals and a sale of the remainder of the land. The fact that the minerals were leased having been established, it then became necessary for the Tax Court properly to apply the governing income-tax law to the transaction between the parties. This having been done correctly, the decision appealed from is affirmed.

LEE, Circuit Judge (dissenting).

On December 28, 1938, J. M. West and his wife and two sons and certain individuals acting as trustees for the West Foundation, hereinafter called "the Wests," executed a deed granting certain lands and interests to the Humble Oil & Refining Company, hereinafter referred to as "Humble." Contemporaneously with the execution of the deed, the Wests entered into a contract with Humble, which contract was incorporated in the deed, by reference.

In the deed the Wests conveyed,[1] subject to certain royalties reserved by the vendors, the fee title to 23,155.60 acres of land and the minerals in and under 70.67 acres of land. Excepted from this conveyance were varying royalties of oil, gas, and other minerals particularly described in the supplemental contract, and the deed expressly provided that "such royalties so excepted and retained are not herein conveyed and shall not be construed as passing to Humble Oil & Refining Company by any language whatsoever in this deed contained, and reference is here made to said supplemental contract for more specific descriptions of the royalties excepted herefrom and retained by the grantors herein."

In the contemporaneous contract it was provided that Humble would operate the properties, and in that connection Humble agreed that it would operate, with reasonable diligence, at least two drilling rigs upon the land situated within the Friendswood oil field, until there had been development to the extent of one well to each twenty acres of the producing area, or to a greater extent if it was necessary to offset drilling on adjacent lands. A similar provision was made with respect to the portions of the lands lying within the Clear Lake oil field. With respect to the lands not included within the two named oil fields, and with respect to the mineral rights above or below, on or existing in the producing horizon, it was provided that should oil or gas be discovered in paying quantities Humble would reasonably develop in these areas or at these horizons. The contract set out the standard of reasonable development and made provision for the drilling of offset wells under certain circumstances. It gave the Wests the right to request Humble to drill five deep test wells within certain areas involved at any time after the expiration of five years after Friendswood and Clear Lake oil fields had been developed to the extent required, and fixed the depth to which Humble was obligated to drill the deep test wells at 10,000

whether the Board has applied the correct rule of law." Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037.

[16] 26 U.S.C.A. Int.Rev.Code, § 1141(c) (1).

[17] Ex facto jus oritur.

[18] Omnia praesumuntur rite et sonniter esse acta donec probetur in contrarium.

[19] 26 U.S.C.A. Int.Rev.Code, § 1141(c) (1).

[1] In consideration of $1,000 and other good and valuable considerations, the Wests "granted, bargained, sold and conveyed" to Humble, "subject, however, to certain outstanding royalty interests, certain exceptions, terms, and provisions hereinafter referred to, more specifically the following:" then followed descriptions of the various tracts.

feet. It gave Humble the right of ingress and egress to and from the tracts in which the minerals only were conveyed, and provided that the Wests should sell their royalty oil to Humble at prevailing market prices for a period of five years. It stipulated that all taxes assessed against the minerals reserved by the Wests were to be paid by the Wests.[2]

These contracts were made and entered into in the state of Texas and covered lands situated in that state. Clearly, therefore, the rights and titles conveyed by them are governed by Texas law.[3]

Under the deed from the Wests, Humble received an absolute fee simple title subject only to the reservation of the undivided interest in the mineral rights (royalty interests) reserved by the Wests. Duhig v. Peavy-Moore Lumber Co., 135 Tex. 503, 144 S.W.2d 878. By the reservation of an interest in the minerals in their deed to Humble, the Wests severed the land conveyed into two estates, one a surface estate and the other a mineral estate. Harris v. Currie, 142 Tex. 93, 176 S.W.2d 302, 305. Thereafter, the mineral estate was owned jointly and in indivision by Humble and the Wests. That this is so is made clear by the Supreme Court of Texas in Harris v. Currie, The court there said:

"In this case, when R. H. Harris conveyed the land here involved to F. L. Harris, he severed [by his reservation] one-half the mineral estate from the balance of the land. By such conveyance, R. H. Harris became the owner of one-half the mineral estate for 15 years. F. L. Harris became the owner of the other one-half the mineral estate and all the surface estate. The only estate R. H. Harris reserved was the one-half mineral estate for 15 years, with the right to certain royalties thereafter, under the terms of the reservation clause in said deed already quoted."

In an earlier case, Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 476, the Supreme Court of Texas said:

"We think it is settled by the decisions of this Court and of this State that a contract affecting land in this State, granting or reserving mineral royalty in such land, constitutes such royalty real property. Stated in another way, a contract affecting land in this State, which grants or reserves mineral royalty in such land, constitutes the owner of such royalty the owner of an estate in such land. Sheffield v. Hogg (Federal Royalty Co. v. State), 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741; Sheppard v. Stanolind Oil & Gas Co., Tex. Civ.App., 125 S.W.2d 643, writ refused; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; State National Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757; O'Connor v. Quintana Petroleum Co., 134 Tex. 179, 191, 133 S.W.2d 112, 134 S.W.2d 1016. It is also settled by our decisions that mineral royalty affecting land in this State, granted or reserved, 'and however payable—whether in the specific product (in oil) or in money measured by the value of the product,' is an interest in the land covered by the contract. Sheppard v. Stanolind Oil & Gas Co., supra, 125 S.W.2d 649; Sheffield v. Hogg (Federal Royalty Co. v. State), supra."

See also Evans v. Mills, 5 Cir., 67 F.2d 840, and authorities therein cited.

When the legal effect, under Texas law, of the deed is considered, it is clear that the contemporaneous agreement was entered into by the parties to take care of and provide for the development of the mineral estate owned in common by them.[4] Such

---

[2] The provisions above set out are the high lights of the contemporaneous contract. The contract in full may be found in the opinion of the Tax Court reported in 3 T.C. at page 431.

[3] It is immaterial for tax purposes by what name local law designates the relationship of the parties (Morgan v. Commissioner, 1940, 309 U.S. 78, 60 S. Ct. 424, 84 L.Ed. 585, opinion amended and rehearing denied, 1940, 309 U.S. 626, 60 S.Ct. 424, 84 L.Ed. 585, but the substantive property rights of the parties as fixed by local law are binding upon the Federal Courts for purposes of taxation (Burnet v. Harmel, 1932, 287 U.S. 103, 106, 53 S.Ct. 74, 77 L. Ed. 199. For example, it is immaterial that Texas law would designate Humble's interest as a "fee estate," but it is material if under Texas law Humble's interest possesses those characteristics which are sufficient to constitute ownership.

[4] Having reserved certain royalties only in the mineral estate conveyed to Humble, the Wests could not, without more, force development. To protect and provide for same, the supplemental agreement was entered into. Cf. Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543; Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43.

being its purpose, it is understandable that many provisions common to an oil and gas lease having to do with development should find their way into the agreement; but it does not necessarily follow that the incorporation into the agreement of such provisions has the effect of changing the absolute conveyance of the surface estate and of an undivided interest in the mineral estate into, as respects the mineral estate, a contract in the nature of a lease. In Freeman v. Magnolia Petroleum Co.,[5] Tex.Civ. App., 165 S.W.2d 111, 114, the court said:

"The law with reference to the nature o the title acquired by the lessee in an ordinary oil and gas lease is well established in this State. He is vested with the title to the oil, gas, and other minerals, and his title is what is known to the law as a determinable fee which is lost upon cessation of the use of the land for the purposes of exploration, development, and production of the minerals that constitute the subject of the contract. Likewise, his interest is lost upon a failure to pay the rentals provided in the lease on or before the date they become due. These are conditions upon which the lessee holds his title and he is divested of the title upon his failure to comply with such conditions, because the lease so provides. After the discovery of oil or gas under a lease which fails to define his duty with regard to further development, the law implies the obligation to continue the development and production of oil or gas with reasonable diligence. Thus, an oil and gas lease contains two distinct elements, namely, conditions and covenants. Failure to comply with a condition in such a lease works a forfeiture of the interests of the lessee, but a breach of a covenant, express or implied, subjects him to a suit for damages. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Benavides v. Hunt, 79 Tex. 383, 396, 15 S.W. 396; Grubb v. McAfee, 109 Tex. 527, 530, 212 S.W. 464; Freeport Sulphur Co. v. American Sulphur Royalty Co. of Texas, 117 Tex. 439, 6 S.W. 2d 1039, 1042, 60 A.L.R. 890; Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App.,

107 S.W.2d 746; McGraw Oil & Gas Co. v. Kennedy, 65 W.Va. 595, 64 S.E. 1027, 28 L.R.A.,N.S., 959."

Testing the contracts under consideration by the yardstick thus laid down, we find that under the contracts Humble was vested with absolute title to all of the mineral estate except that portion represented by the royalties reserved by the Wests; that cessation of the use of the land for the purpose of exploration, production, and development of the minerals will result in no loss to Humble of its title to said mineral interest; and that failure to pay the royalty owned by the Wests to the Wests likewise will result in no loss of title to Humble. Under no circumstances may the Wests regain possession of the interest in the mineral estate transferred to Humble along with the surface estate, either by the lapse of time or by failure of Humble to comply with its contractual commitments. The development provided for in the contemporaneous agreement, relied on so strongly by the Tax Court and by the majority here in the conclusions each reached, is in the main restricted to two small producing areas. The sole provision for development in the undeveloped territory provided for the drilling of three deep test wells, and, if oil was found, for reasonable development of the producing area. On Humble's default, however, the Wests could not recover the properties, nor would they be entitled to operate them or to lease or sell them to others; their sole recourse would be a suit for damages. Following the execution of the contracts, the Wests were no longer owners of the minerals in place; they merely had an interest therein. Absolute title to the mineral estate, subject to their retained royalties, had passed into Humble.[6] The most common attribute, therefore, of a lease contract, namely, the reversionary interest or possibility of reversion, is wholly absent.

The lessee in an ordinary oil and gas lease is vested with "the privilege of exploiting the land for the production of oil and gas for a prescribed period."[7] Bonus payments and continuing royalties received

---

[5] Reversed on other grounds by the Supreme Court, 141 Tex. 274, 171 S.W. 2d 339.

[6] Danciger Oil & Refining Co. v. Powell, 137 Tex. 484, 154 S.W.2d 632, 137 A.L.R. 408; Duhig v. Peavy-Moore Lumber Co., Inc., 135 Tex. 503, 144 S. W.2d 878, 879; Loomis v. Gulf Oil Corp., Tex.Civ.App., 123 S.W.2d 501; Hynson v. Gulf Prod. Co., Tex.Civ.App., 232 S.W. 873; Ralph v. Magnolia Petroleum Co., Tex.Civ.App., 95 S.W.2d 222.

[7] Burnet v. Harmel, 287 U.S. 103, 107, 53 S.Ct. 74, 77 L.Ed. 199.

by the lessor in such a case (or by a lessee making an assignment with the retention of a continuing royalty) are made in return for the temporary use and exploitation of the leased property and are in the nature of rent. The cash payment made here certainly does not fall into that category. No payment was made by Humble for the purpose of obtaining a temporary right to use and exploit the property subject to the reversionary interest of the fee owner; and Humble by its payment received more than the privilege of exploiting the land for the production of oil and gas for a prescribed period. It obtained all rights that go with fee ownership.

In the majority opinion reference is made to the fact that Humble, shortly after the contracts were executed, leased the surface of the land and the large residence thereon to J. M. West for agricultural purposes for a period of five years at a rental of $16,000 per year, and the inference is drawn therefrom that Humble was not interested in the surface title. The evidence shows that Humble first attempted to obtain a lease from the Wests and was informed that the Wests were not interested in making a lease. Negotiations thereafter resulted in the sale and supplemental agreement. While the agricultural lease would indicate that Humble was not particularly interested in the surface estate, it does show that Humble did buy the surface. The refusal of the Wests to lease indicates that Humble had to acquire the surface estate in order to acquire a mineral estate in the lands. Had the contracts specifically sold and conveyed the land and a given portion of the minerals in place, the transaction would have been precisely the same as it was under the language which was employed. Under either, a fixed portion of the minerals in place would be conveyed to Humble. The mineral estate actually conveyed to Humble was all of the minerals in place less the varying royalties in the separate minerals retained by the Wests in the different tracts. The contemporaneous agreement providing for development in no wise changed this result.

So concluding, I dissent from the majority holding that such part of the consideration as was attributable to the mineral rights conveyed represented a bonus or advance royalty, and that the two contracts read together were not, as respects the minerals, a sale but were in the nature of a mineral lease.

Rehearing denied; LEE, Circuit Judge, dissents.