**BENNETT et al. v. SCOFIELD, Collector of Internal Revenue.**

No. 12185.

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1948.

Muckleroy McDonnold, of San Antonio, Tex., for appellant.

Henry W. Moursund, U. S. Atty., of San Antonio, Tex., Theron L. Caudle, Asst. Atty. Gen., and George A. Stinson and Helen Goodner, Sp. Assts. to Atty. Gen., for appellee.

Before HOLMES, WALLER, and LEE, Circuit Judges.

LEE, Circuit Judge.

Appellants, the executors of the estate of Charles M. Armstrong, deceased, as plaintiffs below, sued to recover an overpayment of federal estate taxes with interest. From an adverse judgment, this appeal was taken. The question presented is whether, for federal tax purposes, certain sums owed to the decedent at the time of his death, under an oil and gas lease, are delay rentals and, therefore, the community property of the decedent and his wife, or are to be considered as bonus and the separate property of the decedent.

The facts were stipulated, and those pertinent to the issues before us are as follows: Decedent and his surviving wife were domiciled in the State of Texas. For many years prior to his death, and at the time of his death, decedent owned as his separate property an undivided one-fifth interest in a ranch covering 49,117.8 acres of land in Kenedy County, Texas. Co-owners of the ranch with decedent were his four brothers and sisters. On July 3, 1934, the decedent and the other owners entered into an oil and gas lease with the Humble Oil & Refining Co. for a cash consideration of $100,000. The lease provided for payment by the lessee of the customary one-eighth royalty on oil, gas, or other minerals produced or mined

from the property. The primary term of the lease was five years, with provisions for extending it, under specific conditions,[1] as to certain "selected" and/or "additional" acreage. In good time, the lessee designated 16,372.6 acres as "selected" acreage and elected to retain all the remaining acreage as "additional" acreage. It was agreed that the terms of payment for the additional acreage be changed from a single payment to payment in ten equal annual installments.

The executors of Armstrong's estate considered that the unpaid annual installments, due at the time òf and after decedent's death, constituted delay rentals and treated them as community property of the decedent and his wife. Thereupon, they included only one half of the installments in the decedent's gross estate for federal estate tax purposes. The Commissioner of Internal Revenue determined that those installments constituted bonus or advance royalty payments, and, as such,

---

[1] "Lessee shall have the right to select and designate up to one third (⅓) of the total acreage described in said lease and may execute an instrument in writing describing and designating the acreage so selected. This lease will terminate as to the acreage so selected on July 3, 1939, if operations for drilling a well are not commenced on said land on or before said date, unless on or before such date lessee shall pay or tender to lessors or to their credit * * * rental in the sum of Eight Thousand, One Hundred Eighty Six and 30/100 Dollars ($8,186.30) * * * which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months from said date. In like manner and upon like payments or tenders annually, the commencement of drilling operations may be further deferred as to the acreage so selected for successive periods of twelve (12) months each up to July 3, 1954. Provided, however, that unless oil, gas, or other minerals shall have been discovered in paying quantities on said selected acreage prior to July 3, 1944, this lease as to said selected acreages shall terminate as to both parties unless lessee shall have drilled or shall then be engaged in drilling on such acreage a test well * * *.

"If, prior to the discovery of oil or gas on said land lessee should drill a dry hole or holes thereon, or if after the discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations or commences or resumes the payment of said rental * * * on or before the rental paying date next ensuing after the completion of a dry hole or the cessation of production.

"Subject to the foregoing provisions hereof and those that follow, this lease as to such selected acreage shall continue in full force and effect for a period of twenty (20) years from date hereof, and so long thereafter as oil, gas or other mineral is produced from such selected acreage in paying quantities.

"No rental shall be payable on July 3, 1939, or on any subsequent rental payment date as to such 'selected acreage' in lieu of drilling or production, that is to say, no rental shall be payable while oil, gas, or other mineral is being produced from said premises, nor shall rentals be payable on any rental payment date if lessee is then engaged in drilling operations on said 'selected acreage' provided, however, should the royalties * * * be less than the annual rental * * * hereinabove provided for, in order to maintain this lease in force and effect as to such 'selected acreage,' lessee shall pay * * * the difference between the actual royalties * * * and the rental for such period on the 'selected acreage' hereinabove provided for. * * *

"Additional Acreage

"Should lessee desire to retain under the terms of said lease subsequent to July 3, 1939, more than one-third (⅓) of the total acreage covered hereby, it may at its election do so by designating such additional acreage in writing on or before said date, and by paying or tendering to lessors, or to their credit in said depository banks (one-fifth of said sum being payable to each of said lessors) the sum of Six Dollars ($6.00) per acre for the additional acreage so selected and designated by the lessee. As to such additional acreage so selected by lessee, this lease shall continue in full force and effect without any further payments of any character and without reference to the commencement, prosecution or cessation of operations or cessation of production until July 3, 1954, and thereafter so long as oil, gas or other mineral is produced from such additional acreage in paying quantities, subject to the further provisions hereof. Nothing herein contained shall relieve lessee from the payment, as hereinabove provided for, of royalties on oil, gas or other mineral produced from the premises covered by this lease."

decedent's separate property, includable in his gross estate, and assessed a deficiency estate tax. Plaintiffs paid the deficiency, together with interest, and filed a claim for refund. In due course, the Commissioner rejected the claim.

Applicable federal taxing statutes control the determination of the status of the installments in question, i. e., whether they are bonus or delay rental. In Houston Farms Development Co. v. U. S. A., 5 Cir., 131 F.2d 577, at page 579, the governing principles for distinguishing bonus and delay rental are concisely stated as follows:

" * * * Since Murphy Oil Co. v. Burnet, 287 U.S. 299, 53 S.Ct. 161, 77 L. Ed. 318, and Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, it has been consistently held that cash payments made to obtain an oil lease will, under the income tax laws of the United States, be regarded not as mere consideration for the lease, but as royalties paid in advance for oil expected to be produced, and thus to represent oil taken out just as royalties do, and entitled to the same deduction for depletion of the oil reserve. On the other hand money paid because of delay to produce oil, and to maintain control of the lease, are in the nature of rent, involve no depletion of the oil reserve, and are entitled to no depletion deduction. Commissioner v. Wilson, 5 Cir., 76 F.2d 766. We believe there is no conflict of authority on this point."

The $6 per acre payable on July 3, 1939, to the lessors under the "additional acreage" provisions of the lease was consideration for the lease on that additional acreage. Upon its payment, the Humble Oil & Refining Co. obtained a lease on the additional acreage until July 3, 1954. No further payments, as an alternative to drilling, were necessary to continue the lease in force and effect over the fifteen-year period, and production in paying quantities alone could keep it in force after that period. The sum paid for the additional acreage, therefore, is bonus for granting extension of the lease coverage to include that acreage; it constituted an advance royalty payment in that it secured the right to enter on and use that additional acreage for mineral exploitation. It is to be paid by the lessee and retained by the lessor, regardless of whether oil or gas or other mineral be found there and irrespective of whether a well is ever drilled there.[2]

Under the lease, the successive annual rental payments on the "selected" acreage after the third day of July, 1939, operate to maintain the lease in effect as to that acreage, and to defer the commencement of a well thereon for the successive yearly periods. These payments, expressly called "rental" in the lease, are delay rentals and are made as an alternative to drilling.

Ownership of the bonus or delay rentals paid under a lease covering lands in Texas depends on Texas law. Poe v. Seaborn, 282 U.S. 101, 51 S.Ct. 58, 75 L. Ed. 239. Under that law, the bonus paid for an oil and gas lease on lands owned separately by the husband fall into the husband's separate property; delay rentals under such a lease fall into the community with his wife.[3] As the $6.00 per acre paid for the lease on the additional acreage was a bonus or advance royalty payment, it belonged, as the court below held, to the separate estate of the decedent.

Appellants did not designate the complete record to be sent up; nor did they designate as a point upon which they intended to rely, in accordance with Rule 75 (d), Federal Rules of Civil Procedure, 28 U.S.C.A., the failure of the trial court to admit in evidence certified copies of certain pleadings made in a State court of original jurisdiction and that court's judgment. We, therefore, may not consider appellants' contention that the trial court erred in failing to receive the pleadings and the judgment referred to. It is not properly before us.

The judgment appealed from is affirmed.

[2] Anderson v. Helvering, 310 U.S. 404, 409, 60 S.Ct. 952, 84 L.Ed. 1277; Burnet v. Harmel, 287 U.S. 103, 111, 53 S.Ct. 74, 77 L.Ed. 199.

[3] Ferguson v. Commissioner, 5 Cir., 45 F.2d 573; Turbeville v. Commissioner, 5 Cir., 84 F.2d 307; Commissioner v. Wilson, 5 Cir., 76 F.2d 766.