ESTATE OF BUDD FRANKENFIELD, DECEASED (MABEL W. FRANKENFIELD, FORMER EXECUTRIX), LORRAINE F. RUDE, EXECUTRIX, ET AL.,* PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28269, 28270, 28271. Promulgated February 14, 1952.

*Walter E. Bennett, Esq.*, for the petitioners.
*Donald P. Chehock, Esq.*, for the respondent.

### OPINION.

TIETJENS, *Judge:* The following deficiencies in income tax are involved in these consolidated proceedings:

| Docket No. | Year | Amount |
|---|---|---|
| 28270 | 1946 | $1,905.53 |
| 28269 | 1947 | 1,716.13 |
| 28271 | 1948 | 2,378.57 |

The sole issue is whether monthly payments received under the terms of a lease constituted ordinary income, as determined by respondent, or amounts received from the sale of a capital asset subject to the provisions of section 117 of the Internal Revenue Code, as contended by petitioners.

Another issue involving a gift contribution for the year 1946 has been settled by amendments to the pleadings and necessary adjustments can be made under Rule 50.

The returns here involved were filed with the collector of internal revenue for the sixth district of California at Los Angeles, California.

All of the facts have been stipulated.

A summary of the facts will be helpful in understanding the issue.

Under date of February 16, 1906, J. Frankenfield, the father of Budd Frankenfield, leased to one John Grosse, for a term of 50 years,

---

*Proceedings of the following petitioners are consolidated herewith: Estate of Budd Frankenfield, Deceased (Mabel W. Frankenfield, former Executrix), Lorraine F. Rude, Executrix, Mabel W. Frankenfield; and Estate of Budd Frankenfield, Deceased (Mabel W. Frankenfield, former Executrix), Lorraine F. Rude, Executrix.

a parcel of downtown real property in Los Angeles, California. This lease will hereafter be called the "Grosse lease." Through mesne assignments the lessee's interest in the Grosse lease many years ago became lodged, and still remains, in Bullock's, Inc., a corporation.

The Grosse lease contained the following provisions, among others not material to this proceeding:

That the Lessor, in consideration of the promises and agreements on the part of the Lessee hereinafter contained, does hereby lease, demise, and let unto the Lessee all those certain lands and premises situated, lying and being in the City of Los Angeles, County of Los Angeles, State of California, more particularly bounded and described as follows, to-wit:

Lot Three (3) of Block Eighteen (18) of Ord's Survey in the City of Los Angeles, having a frontage of Thirty-five and one-half (35½) feet on the West side of Broadway between Sixth and Seventh Streets, and extending West from the Westerly line of Broadway to the Easterly line of St. Vincent's Place.

For a term of fifty (50) years, commencing on the first day of June A. D. 1906, and ending on the thirty first day of May A. D. 1956, at the rental for said term as follows, to wit:

The rental for the first three (3) years of said term, commencing on the first day of June A. D. 1906 and ending on the thirty-first day of May A. D. 1909, shall be Three Hundred Dollars ($300.00) per month, payable monthly in advance.

The rental for the next seven (7) years of said term, commencing on the first day of June A. D. 1909 and ending on the thirty-first day of May A. D. 1916, shall be Five Hundred Dollars ($500.00) per month, payable monthly in advance.

The rental for the remainder of said term, to wit, forty (40) years, commencing on the first day of June A. D. 1916, and ending on the thirty-first day of May A. D. 1956, shall be Five (5) per cent upon the appraised value of said land, appraisement thereof to be made at the times, and in the manner hereinafter provided; the said Forty (40) years remainder of said term to be divided into periods of five (5) years each, an appraisement as hereinafter provided to be made for each of said periods of five (5) years, and the rent for each of said periods to be based upon the respective appraisements for each of said periods. * * *

The said appraisements from which the value of the demised premises for the purpose of fixing the said rental as herein provided is to be determined, shall, for each of said periods, be made at least ninety (90) days before the commencement of such periods, and shall be an appraisement of the value of the ground property only, and shall be wholly exclusive of the improvements placed thereon by the lessee, or any improvements thereon whatever, and shall be made as follows, to-wit: * * *

* * * * * * *

When the value of the demised premises, exclusive of any improvements thereon, shall be ascertained and determined for such or either of such periods as hereinbefore provided, the rental each year of such period shall be divided into twelve (12) equal parts, and one of said parts shall be paid in advance on the first day of each month of such period of five (5) years beginning the first day of June of the first year of such period.

* * * * * * *

It is expressly stipulated however, that in no event after the first period of three years hereinbefore designated, shall said rental amount be less than the sum of five hundred dollars ($500.00) per month, payable monthly in advance

upon the first day of each calendar month; and if the value of said property at any period or periods hereinbefore fixed, shall be determined to be less than one hundred and twenty thousand dollars ($120,000) the rental for such period or periods shall be the sum of five hundred dollars ($500.00) per month, payable as aforesaid.

In consideration of this lease the lessee does hereby covenant and agree with the lessor that he will construct, erect and complete on the lands and premises hereby demised, a building of four stories or more, such building to be completed on or before the first day of July, 1908, unless delayed by fire, strikes, unavoidable accidents or unusual disturbances of nature, such building to cost not less than Thirty Thousand Dollars ($30,000).

The lessor shall remove the building now upon said demised premises at his own expense  *  *  *.

In the event of the failure of the lessee to construct and complete said building as herein provided and within the time herein limited or to pay and discharge all claims for material furnished or labor done or other expense which shall become or might become a lien upon said building or of the failure of the said lessee to pay the rentals herein specified or to keep said building insured as stipulated, or to pay any legal taxes or assessments upon the said building or lot upon which the same is situated, then, or in either of said events, the said lessor may, at his option, terminate this lease, and thereupon all interest of the said lessee therein and thereunder shall terminate and the said lessor shall be entitled to immediate possession of said building and the lot upon which the same is situated.

Provided, however, that before terminating this lease for failure to do or perform either one of the things above specified the lessor shall serve upon the lessee, his successors or assigns, a written demand  *  *  *.

*       *       *       *       *       *       *

Except as otherwise provided, the lessee agrees to pay the rentals hereinbefore provided at all times and in the manner hereinbefore provided, and to pay before the same become delinquent all municipal, County and State taxes, and all assessments of every character, and all license charges, that may be properly assessed against the said lands or premises or the improvements thereon at any time during the currency of this lease, and to keep said premises and all improvements in good repair and condition at his own expense, and not to waste or permit waste or strip thereof, and that he will during the currency of this lease keep the improvements to be constructed on said premises at all times separately insured against fire, to the amount of their insurable value in a reliable insurance company or companies, and said policies shall provide that in case of partial or total destruction of said improvements by fire the insurance money shall be paid to the Los Angeles Trust Company of Los Angeles, California, as Trustees. The said Trust Company shall pay to the person or persons furnishing labor or materials for the reconstruction or repairs of said building upon proper architects certificates, all of said insurance money; and said lessee further agrees that in case of the partial or total destruction of said improvements by fire, he will immediately repair or re-construct the same, so that the same shall be in a good order and condition, and of as much value as before the fire; and that for that purpose he will invest in said repairs and re-construction, not less than the amount received from said insurance.

And it is further agreed between the parties hereto that on the termination of this lease all buildings and improvements placed upon said land hereby demised shall become the exclusive property of the said party of the first part.

J. Frankenfield died on August 31, 1914. The real property covered by the Grosse lease descended to his three children, an undivided one-third interest to each. Budd Frankenfield inherited a one-third interest from his sister, Nellie Edwards, on June 2, 1940, and thereby became owner of an undivided two-thirds interest in the property. Budd died on February 1, 1948.

The downtown store of Bullock's, Inc. during the years 1940 to date and for many years prior thereto has been one of the largest department stores in Los Angeles. It is located in the center of the downtown business district, between 6th and 7th, Broadway and Hill Streets—four of the city's main streets. The store has frontage on Hill Street, the entire block on 7th Street, and something over 200 feet on Broadway, with store entrances on all three streets. While the store is a complete unit through connecting entrances, it is made up of some seven buildings ranging from seven to eleven stories in height. The largest of these is the Earl Building, at the corner of 7th and Broadway, with a frontage of 144.36 feet on 7th and 138.77 feet on Broadway. The Hollenbeck Building, another unit of the store, adjoins the Earl Building on Broadway with a Broadway Street frontage of 70.74 feet. The Frankenfield property, involved here, is part of the Earl Building next to the Hollenbeck Building. It has a Broadway frontage of 35½ feet and extends back through the approximate middle of the store for the 144.36 foot depth of the Earl Building.

Under date of March 1, 1943, Budd Frankenfield and Citizens National Trust & Savings Bank of Los Angeles as trustee for Marjorie Hines Thompson, lessors, and Bullock's, Inc., as lessee, entered into a lease agreement (hereafter called the "Bullock's lease") covering the same property described in the aforementioned Grosse lease.

The Bullock's lease contained the following provisions, among others not material to this proceeding:

The land leased hereby is subject to a lease dated February 16, 1906, made by J. Frankenfield to John Grosse for a term ending May 31, 1956, which is hereinafter referred to as the "Grosse lease". * * *

* * * It is provided in the said [Grosse] lease that upon its termination all buildings and improvements placed upon said leased land shall become the exclusive property of the lessor.

*　　　*　　　*　　　*　　　*　　　*　　　*

In consideration of the premises and of the agreements herein contained, each of the parties agrees as follows:

1.

LEASE

The Lessors lease to the Lessee and the Lessee leases from the Lessors the real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

*　　　*　　　*　　　*　　　*　　　*　　　*

## 2.

### TERM

The term of this lease shall be fifty (50) years commencing on June 1, 1956, and ending on May 31, 2006.

## 3.

### SALE OF BUILDING AND IMPROVEMENTS

Under the provisions of the aforesaid Grosse lease, the building and improvements now existing on the leased property or any substitute therefor existing on the leased property at the end of the term of said Grosse lease will become the exclusive property of the lessor at the end of the term of the said Grosse lease. The Lessors hereunder agree to sell to the Lessee and the Lessee agrees to buy the said building and improvements or any such substitute therefor for the price and on conditions as herein provided. The Lessee shall pay to the Lessors therefor the sum of $475.00 on March 31, 1943, and the sum of $475.00 on the last day of each of every month thereafter to and including May, 1956. Upon the completion of the said payments said building and improvements shall become the property of the Lessee, provided that they shall remain on the leased premises throughout the term of this lease as security for the performance of the Lessee's obligations hereunder, and shall be subject to the covenants and conditions of this lease respecting them.

Upon a cancellation or termination of this lease before June 1, 1956, as hereinafter provided for, all rights of the Lessee to a transfer of the buildings and improvements, and all obligations of the Lessee under this paragraph accruing after such cancellation or termination, shall be terminated and ended. Upon any such cancellation or termination for any reason except a default of the Lessors under this lease or a default of the lessors under the said Grosse lease, all payments theretofore made under this paragraph shall be retained by the Lessors. Bullock's, Inc. guarantees the payment of the amounts payable under this paragraph so long as this lease continues in force regardless of any assignment of this lease.

Payments provided for in this paragraph may not be anticipated or paid in advance of due date without the consent of the Lessors.

## 4.

### RENT

For the ten-year period commencing June 1, 1956, the annual rent shall be an amount equal to five per cent of the appraised value of the leased land fixed as hereinafter provided, but not less than $17,750.00 per year.

For the remaining part of the term the annual rent shall be an amount equal to five per cent of the appraised value of the leased land fixed as hereinafter provided, but not less than $6,000.00 per year.

The annual rent shall be paid in twelve equal monthly installments payable in advance on the first day of each calendar month.

*Appraisement*

The appraised value of the land shall be determined and fixed as at June 1, 1956, for the purpose of fixing rent for the ten-year period commencing June 1, 1956, as at June 1, 1966, for the purpose of fixing rent for the ten-year period commencing June 1, 1966, * * *

*Payment of Rent*

\*       \*       \*       \*       \*       \*       \*

All rents herein provided for shall be paid without any abatement or deduction whatever, and said rents shall be paid as net amounts over and above all costs, taxes, assessments, charges and expenses of every nature which the Lessee is required to pay.

\*       \*       \*       \*       \*       \*       \*

## 5.

### TAXES AND ASSESSMENTS

The Lessee shall and agrees to pay, in addition to the rents and other payments above provided for, all municipal, county and state taxes and all assessments of every character, and all license charges that may properly be levied or assessed against the leased lands or premises or the building and improvements thereon at any time during the currency of this lease, and to pay the same before delinquency. \* \* \*

\*       \*       \*       \*       \*       \*       \*

The land covered by this lease shall be listed and assessed for the purpose of taxation and assessments in the name of the Lessors, provided such is permitted under the statutes relating thereto. Taxes and assessments levied or assessed against said property shall be paid in the name of the Lessors. \* \* \*

\*       \*       \*       \*       \*       \*       \*

## 6.

### REPAIR AND MAINTENANCE OF BUILDING. NEW CONSTRUCTION.

The Lessee agrees to and shall during the term hereof keep and maintain the building and improvements on the leased property in good repair and in good, first-class and safe condition, and in compliance with all applicable laws and lawful regulations and governmental requirements thereunder \* \* \*.

The Lessee shall not remove or destroy the building or improvements, in whole or in part, or commit or permit wastes thereof, and shall not make structural changes or alterations therein, or changes in the exterior of the building, which will impair the value of the building or improvements for store purposes or render them less fit for store purposes, without first obtaining the written consent of the Lessors. The Lessee, on the conditions herein provided, at its own cost and expense, may make reasonable changes or alterations in said building and improvements in other respects that it may deem necessary or convenient for its use for store purposes.

If the building or improvements on the leased property should be damaged or destroyed in whole or in part from any cause or casualty, the Lessee shall at its expense and promptly and with reasonable diligence repair, restore or reconstruct the building or improvements so as to place the same in substantially the condition existing before the damage or destruction, or construct a new building of the type and construction similar to the said building so destroyed and to cost not less than an amount by which the reasonable market value of the leased land with the old building and improvements thereon in condition and repair as herein provided for exceeded the reasonable market value which the land alone would have at the time just preceding the destruction.

However, if the building on the leased premises is totally or substantially totally destroyed, or is damaged to such an extent that the building cannot be

used for the Lessee's purposes and the repair of reconstruction would require more than four (4) months to complete the same, and if destruction or damage shall occur within two (2) years before the expiration of the term of this lease, then the Lessee may terminate this lease and its rights and obligations hereunder by complying with the following: It shall notify the Lessors of its desire to terminate. It shall cause to be vested in the Lessors the right to have and receive all of the insurance moneys. If the destruction is not total or substantially total, it shall pay to the Lessors any amount required over and above the insurance moneys to repair, restore or reconstruct the said building and improvements to a condition substantially the same as exists on the date hereof, subject to reasonable wear and tear for the period elapsed after the date hereof. If the insurance money is less than eighty (80) per cent of the reasonable insurable value just preceding the casualty of the building and improvements in condition and repair as herein provided for, and the loss or damage is total or substantially total or in an amount exceeding the insurance money, the Lessee shall pay to the Lessors an amount to make up any deficiency up to the amount of the loss or damage or eighty (80) per cent of the said reasonable insurable value whichever is the smaller. The full amount of the insurance money shall be paid to the Lessors in any of such events.

  *   *   *   *   *   *   *

If the Lessee shall be in default in performing the covenants or conditions relating to the maintenance, repair, restoration, reconstruction, alteration or construction as provided for in this section, the Lessors may at their option enter upon the premises and do or cause to be done the work as to which the Lessee is in default, and the reasonable cost thereof shall be immediately due from the Lessee to the Lessors * * *.

  *   *   *   *   *   *   *

## 8.

### INSURANCE

The Lessee agrees to and shall keep the building and improvements on said property insured * * * in an amount of not less than eighty per cent (80%) of the sound insurable value of said building and improvements * * *.

The said insurance policy or policies shall be drawn so that the amounts payable thereunder shall be paid, to the extent that the said amounts are payable on account of insurance on the building and improvements, to a trustee named in writing by the Lessors or the owners of not less than a two-thirds (⅔) interest in the leased property. * * *

The trustee is authorized to pay the insurance moneys collected by it to the Lessee in four equal installments as the injury or damage done by the casualty insured against is repaired or as reconstruction after such injury, damage or destruction progresses and the costs of such work are paid for * * *

  *   *   *   *   *   *   *

If the Lessee shall be in default in performing the covenant or condition to repair, restore or reconstruct the building or improvements or to construct a new building after damage to or destruction of the building or improvements, and the lease is not terminated and the Lessors undertake to do such work, the trustee shall pay the insurance money to the Lessors in the manner provided for its payment to the Lessee.

If the Lessee shall be in default and the lease shall be terminated by reason thereof, or if the lease is otherwise terminated for causes other than eviction

or breach of the covenant of quiet enjoyment, or if the term hereof expires, while the insurance moneys are in the possession of the trustee or before the insurance moneys have been paid by the insurance company, the insurance moneys shall be paid to the Lessors. * * *

Reference is made to Paragraph 6 of this lease for provisions for the payment of the insurance money to the Lessors in certain events if the building is totally or substantially totally destroyed within the last two years of the term.

### 9.

### USE OF PREMISES AND INDEMNITY

The leased premises shall be used in conjunction with the premises adjoining on the south bounded by Broadway, St. Vincent's Place and Seventh Street, covered by the Tehama lease hereinbefore referred to, for the purpose of conducting in the combined premises a business for the sale of merchandise, including uses connected with or incidental to such business. * * *

\* \* \* \* \* \* \*

### 10.

### ASSIGNMENT

This lease may be assigned to an assignee which also acquires or owns the lessees' interests for terms substantially as long as the term hereof, or the owners' interests, in the property adjoining the leased property on the south covered by the Tehama lease above referred to. Prior to June 1, 1956, this lease may be so assigned only to an assignee who also acquires and holds the lessees' interest under the Grosse lease or the interest of the sub-lessee under the Tehama lease. This lease shall not be assigned, except as above provided, and the leased property shall not be subleased and a sublessee shall not be assigned until and unless a written consent thereto of the Lessors is first obtained. * * *

The Lessee shall not assign this lease or make any sublease hereunder while there is any existing default hereunder or while any rent which has become due hereunder is unpaid.

\* \* \* \* \* \* \*

If the Lessee's interest in this lease is assigned as permitted hereunder before the purchase price payable by the Lessee under the provisions of Paragraph 3 of this lease has been paid in full, the assignor Lessee shall continue to be liable for the performance of the Lessee's obligations hereunder which shall accrue or become due for performance prior to the time that the said purchase price has been paid in full.

If the Lessee's interest in and under this lease is fully and completely assigned so that the assignor retains no interest in or under the lease * * * the assignor Lessee shall be released from all obligations hereunder which shall accrue or become due for performance after the effective date of the assignment, after May 31, 1956, and after the time that the said purchase price provided for in Paragraph 3 hereof has been paid in full. *· * *

\* \* \* \* \* \* \*

### 11.

### TERMINATION ON DEFAULT

If the Lessee shall be in default in the payment of any installment of rent or of any amount owing to the Lessors hereunder or in the payment of any taxes

or assessments, or in the performance of any covenant or condition of this lease, the Lessors may at any time while any default exists serve upon the Lessee a notice in writing of such default and demand for performance, specifying the default and the performance required. If the default specified in the notice is in the payment of rent or any amount owing by the Lessee under the provisions of Paragraph 3 or 4 or this lease, and said default or any later default in the payment of rent or in the payment of any amount owing under said Paragraph 3 or 4 shall continue or exist on the elapse of fifteen (15) days after said notice was served, or if the default specified in the notice is in the preformance of any other covenant or condition of the lease and said default, or any later default in the performance of the covenants or conditions of the lease as to which the said specified default occurred, shall continue or exist on the elapse of thirty (30) days after said notice was served, the Lessors may at any time thereafter while the default continues terminate this lease and all rights of the Lessee and persons holding or claiming under it by serving on the Lessee a written notice of such termination. Notice of default and notice of termination need be served only on the Lessee and need not be served on any person claiming or holding under the Lessee, whether as sublessee, licensee, concessionaire, or otherwise. If the default is in the performance of a covenant or condition which requires time to complete the work of performance, and such performance commenced and carried on with reasonable promptness and diligence cannot be completed within the thirty (30) days' time after the service of notice of default, the time for performance shall be extended for a reasonable time, provided the said work of performance is commenced with reasonable promptness after the notice is served and carried on with reasonable diligence to completion.

\* \* \* \* \* \* \*

The Lessee covenants and agrees that upon the expiration of the term of this lease or upon a termination of this lease as herein provided for, it will surrender and peaceably deliver up the leased premises and the building and improvements thereon to the Lessors in good condition and repair, subject to reasonable wear and tear, and free from liens, claims, or defects of title created by the Lessee or persons claiming or holding under it or resulting from their acts or neglects or from failure to perform any covenant or condition hereof on the Lessee's part to be performed.

\* \* \* \* \* \* \*

12.

## BUILDING AND IMPROVEMENTS

Where this lease refers to or makes provision regarding the building and improvements, it means the building and improvements which exist on the leased property at the date of this lease and any additions to and alterations of the building, and any additions to and substitutions for the improvements, and any building or improvements which may be erected on the property to replace the building and improvements existing on the date hereof. \* \* \*

The covenants and conditions that the building and improvements shall be kept in good condition and repair mean that the building and improvements and the fixtures and equipment therein shall be kept in or restored to the state and condition substantially the same as or equivalent to those which now exist, subject to ordinary and reasonable wear and subject to reasonable changes, improvements, substitutions and replacements which do not subtract from the building, improvements or equipment.

On the expiration of the term of this lease or on a termination of the lease, the buildings and improvements on the leased property shall become the exclusive property of the Lessors subject to any rights of the Lessee under the Grosse lease if this lease is terminated prior to the expiration of the term or the termination of said lease.

Upon the expiration of the term hereof or on a sooner termination of the lease, the Lessee will restore the partitions in each floor between the building on the leased premises and the building on the property to the north now known as the Hollenbeck property. The partitions will be restored in a finished condition and plastered and decorated to match the other portions of the building.

Upon the expiration of the term of this lease or upon a sooner termination of the lease, the Lessee will cooperate with the Lessors to procure a suitable separation, as desired by the Lessors, of the portion of the building and improvements on the leased property from the portion of said building on the Lankershim property to the south.

*     *     *     *     *     *     *

## 14.

### MISCELLANEOUS

*     *     *     *     *     *     *

The Lessors, by themselves or their representatives, may go upon the leased property to inspect the building, improvements, equipment and appurtenances and the manner in which the Lessee is using the property. * * *

*     *     *     *     *     *     *

## 17.

### GROSSE LEASE IS SEPARATE FROM THIS LEASE

It is understood and agreed that the aforesaid Grosse lease and the interest of Bullock's, Inc. thereunder are separate and distinct from this lease and the interest of the Lessee hereunder, that said lease or the interest of Bullock's, Inc. thereunder or the rights or obligations of the parties thereto are not affected or changed by this lease, that a default in performance of a covenant or condition of this lease which does not constitute a default under said older lease shall not affect said older lease or the rights or obligations of the parties thereto or of Bullock's, Inc. thereunder, that a forfeiture or termination of this lease shall not affect the older lease or the rights of Bullock's, Inc. thereunder, and that any remedies for any default under, or failure to perform a covenant or condition of, said older lease shall be exercised independently under said older lease.

If the said Grosse lease is terminated at any time prior to the expiration of the term thereof on May 31, 1956, this lease shall also terminate and end or be cancelled at the same time that the said Grosse lease shall end or terminate.

A termination of the Grosse lease by the lessee thereunder, or a termination of this lease by the Lessee hereunder during the term of the Grosse lease, by reason of an eviction by any person lawfully claiming the property or a part thereof shall not constitute a waiver by the Lessee of any rights or remedies for damages for nonperformance of the agreement to sell and transfer the building and improvements on the leased property, it being understood that this provision does not constitute an agreement or concession by the Lessors that any right or remedy shall exist in any particular event.

*     *     *     *     *     *     *

### 19.

This lease and each of its convenants and conditions shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and legal representatives and their respective assigns, subject to the provisions hereof.  *  *  *

\*          \*          \*          \*          \*          \*          \*

Also under date of March 1, 1943, the same parties entered into another agreement agreeing to "the value of said Frankenfield land for the appraisal periods beginning June 1, 1946, and June 1, 1951, and to fix the rental for said appraisal periods." This agreement, hereinafter referred to as the "Rent Appraisement Agreement", contained the following provisions, among others not material to this proceeding:

\*          \*          \*          \*          \*          \*          \*

NOW, THEREFORE, it is agreed between the parties hereto as follows:

1. For all purposes contemplated by the aforesaid Frankenfield lease, the value of the above described Lot 3 of Block 18 of Ord's Survey in the City of Los Angeles, having a frontage of 35½ feet on the West side of Broadway between Sixth and Seventh Streets, and extending West from the Westerly line of Broadway to the Easterly line of St. Vincent's Place, and herein referred to as the Frankenfield property, exclusive of the improvements located thereon, as of June 1, 1946, and also as of June 1, 1951, is hereby fixed at the total sum of five hundred fifty thousand two hundred and fifty dollars ($550,250.00) ; all subject, however, to the further provisions of this agreement.

2. The ground rental to be paid to the First Parties hereto, under the aforesaid Frankenfield lease, for the appraisal periods beginning June 1, 1946, and June 1, 1951, shall be five per cent (5%) per annum on said value of five hundred fifty thousand two hundred and fifty dollars ($550,250.00), payable as provided for in said Frankenfield lease, plus any amounts which may be payable under the provisions of Paragraph 3 of this agreement. Second Party hereto agrees that the rental will be paid at said rate and in said amounts for said periods.

3. Because of existing war conditions and the possibility of a general inflation of values, it is further agreed that if the "net sales" (as the term "net sales" is hereinafter defined) of merchandise and services at the Downtown Los Angeles store of Second Party shall exceed thirty-six million dollars ($36,000,000.00) in any fiscal year of Second Party from June 1, 1946, to May 31, 1956, Second Party shall pay to First Parties, as additional rent, in addition to the rental equal to 5% per annum on the said value of five hundred fifty thousand two hundred and fifty dollars ($550,250.00), a sum equal to one-tenth (1/10th) of one percent (1%) of the amount by which such "net sales" for such fiscal year exceeded thirty-six million dollars ($36,000,000.00).

In the income tax returns here involved petitioners have treated the $475 monthly payments received under paragraph 3 of the Bullock's lease as amounts received from the sale of a capital asset, have claimed a cost basis, and have reported the difference on an installment basis as a long term capital gain. On the other hand, respondent has determined these amounts to constitute ordinary income.

Petitioners' argument is that petitioners' interest in the building located on the land covered by the Grosse and Bullock's leases was a

future interest, a capital asset, subject to sale; that the provisions of paragraph 3 of Bullock's lease amount to a sale of that interest; and that the obligation to make the monthly payments constitutes an installment obligation covering the purchase price of the building subject to accrual under section 44 (d) of the Internal Revenue Code.

This argument by-passes the heart of the question, which is, whether there actually was a sale or whether the amounts paid were in the nature of rent or a bonus for extending the Grosse lease for another 50-year period. The answer to this and analogous questions is not always easy. See *Truman Bowen*, 12 T. C. 446.

To get the answer we must look at the transactions as a whole. *Hirsch Improvement Co.* v. *Commissioner* (C. A. 2), 143 F. 2d 912, certiorari denied 323 U. S. 750; *Gilken Corporation*, 10 T. C. 445, affd. (C. A. 6) 176 F. 2d 141. We cannot carve out paragraph 3 of the Bullock's lease and treat it separately from the detailed and voluminous provisions of that lease of which it was a part. Of necessity we must also look to the Grosse lease, of which the Bullock's lease was an extension or renewal. That is why we have set out in what may be tiresome detail the provisions of those leases. None of the parties to the leases testified and it is only from the documents themselves and the stipulated facts that we can gather the nature of the payments.

Despite the language employed in paragraph 3 of the Bullock's lease, we are convinced that no sale or exchange of the building was actually intended or accomplished. In reaching this conclusion we give some weight to the absence of any provision for conveyance. We note also that the building and improvements are to "remain on the leased premises throughout the term of this [Bullock's] lease as security for the performance of the Lessee's obligations hereunder" and that they are to be subject to the covenants and conditions of the lease, just as they had been also subject to the covenants and conditions of the Grosse lease. No essential change at all took place in the fundamental relationship already existing between the parties with respect to the building. That, basically, was a lessor-lessee relationship and we cannot see that it was transformed into something different by the recitals in paragraph 3.

Further examination of the provisions of both leases with respect to ownership of the building indicates that no sale by the lessors to the lessee took place. The Grosse lease provided that at the end of its term, May 31, 1956, all buildings and improvements were to become the property of the lessors (the Frankenfields). Paragraph 3 of the Bullock's lease, however, provided that on that date the building and improvements were to become the property of the lessee. But paragraph 12 of the same lease stipulates that upon expiration of the term of the lease (May 31, 2006) the buildings and improvements are

to become the exclusive property of the lessors (the Frankenfields). The fair import of these provisions read together is that no real change in ownership of the building and improvements was contemplated. We conclude that what the parties really intended was simply a continuation for another 50-year term of the lessor-lessee relationship begun under the Grosse lease in 1906. Paragraph 3 of the Bullock's lease fits into this continuation by postponing for another 50 years any change in ownership of the building and improvements. For all practical purposes the parties in this respect are in the same position under the Bullock's lease as when their lessor-lessee relationship began under the Grosse lease. This does not add up to a sale or exchange of the building. There being no sale or exchange, section 117 does not apply.

In analagous fact situations, though perhaps not on all fours with this, the courts have held that payments purporting to be for buildings on leased land constituted either rental payments or a bonus for renewal of the lease, *Crile* v. *Commissioner* (C. A. 6), 55 F. 2d 804, affirming 18 B. T. A. 588, certiorari denied 287 U. S. 600; *Gates, Trustee* v. *Helvering* (C. A. 8), 69 F. 2d 277, affirming this point, 26 B. T. A. 998; *Lindley Trust* v. *Commissioner* (C. A. 8), 120 F. 2d 998, affirming 42 B. T. A. 509; and, accordingly, were taxable as ordinary income. The result is the same no matter which description is used for the payments here involved. In the circumstances of this case, however, it seems probable that the payments were a bonus or incentive in the form of increased rent for the interim, held out by Bullock's, Inc. to the lessors for entering into an arrangement 13 years ahead of the expiration of the Grosse lease, whereby Bullock's, Inc. secured a renewal or continuation of the Grosse lease for another 50-year term. As such they are taxable as ordinary income.

Petitioners argue that the *Gates* and *Crile* cases, *supra*, cannot govern this case because they were decided prior to the enactment of sections 22 (b) (11) and 113 (c) of the Internal Revenue Code. These sections and the applicable regulations are set out in the footnote.[1]

---

[1] SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(11) IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY.—Income, other than rent, derived by a lessor of real property upon the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

REGULATIONS 111.

SEC. 29.22 (b) (11)-1. EXCLUSION FROM GROSS INCOME OF LESSOR OF REAL PROPERTY OF VALUE OF IMPROVEMENTS ERECTED BY LESSEE.—Income derived by a lessor of real property, upon the termination, through forfeiture or otherwise, of the lease of such property and attributable to buildings erected or other improvements made by the lessee upon the leased property is excluded from gross income. \* \* \* The exclusion applies only with respect

As respondent points out, however, section 22 (b) (11) applies to income, *other than rent*, derived by the lessor *upon termination of a lease* representing value attributable to buildings erected by the lessee. No termination of the lease is here involved and as we have indicated above, the income in question was in the nature of rent. Accordingly, it is our opinion that the sections of the Code relied on by petitioners are not pertinent here.

Because other agreed on adjustments are to be made,

*Decision will be entered under Rule 50.*

---

to the income realized by the lessor upon the termination of the lease and has no application to income, if any, in the form of rent, which may be derived by a lessor during the period of the lease and attributable to buildings erected or other improvements made by the lessee. It has no application to income which may be realized by the lessor upon the termination of the lease but not attributable to the value of such buildings or improvements. Neither does it apply to income derived by the lessor subsequent to the termination of the lease incident to the ownership of such buildings or improvements.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

\*         \*         \*         \*         \*         \*         \*

(c) PROPERTY ON WHICH LESSEE HAS MADE IMPROVEMENTS.—Neither the basis nor the adjusted basis of any portion of real property shall, in the case of the lessor of such property, be increased or diminished on account of income derived by the lessor in respect of such property and excludible from gross income under section 22 (b) (11). \* \* \*

REGULATIONS 111.

SEC. 29.113 (c)–1. PROPERTY ON WHICH LESSEE HAS MADE IMPROVEMENTS.—In any case in which a lessee of real property has erected buildings or made other improvements upon the leased property and the lease is terminated by forfeiture or otherwise resulting in the realization by such lessor of income which, were it not for the provisions of section 22 (b) (11), would be includible in gross income of the lessor, the amount so excluded from gross income shall not be taken into account in determining the basis or the adjusted basis of such property or any portion thereof in the hands of the lessor.. \* \* \*