*Decisions will be entered under Rule 50.*

HAROLD E. JAHN AND MARY JAHN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5276–69. Filed June 12, 1972.

*Leonard J. Simasko*, for the petitioners.
*Patrick R. McKenzie*, for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies against petitioners for the taxable years 1964 and 1966 in the amounts of $3,164.56 and $21,141.16, respectively.

The principal issues presented for our consideration are (1) whether a $50,000 payment was the proceeds of a sale of a three-eighths interest in all the minerals lying beneath petitioners' farm to Neyer and Andres or whether it represented a bonus or advance royalty under a lease, and (2) whether the petitioners received as part of a settlement in 1966 of their claims against Michigan Consolidated Gas Co. royalty payments amounting to $159,718.95.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found and incorporated herein by reference.

Petitioners Harold E. Jahn and Mary Jahn are husband and wife whose residence was in St. Clair, Mich., at the time the petition herein was filed.

The petitioners filed their income tax returns for the calendar years 1964 and 1966 with the district director of internal revenue, Detroit, Mich.

Petitioners owned real property in St. Clair County, Mich., and on January 2, 1964, entered into an agreement with John Neyer and Ray Andres with respect to such property whereby Neyer and Andres agreed to "commence to drill on the permitted location * * * and shall proceed with all due diligence to drill such well to completion at their sole risk and expense."

Neyer and Andres were to "operate, or arrange for operation, of all wells on the premises covered hereby, and shall market the production therefrom at not less than going field prices."

Petitioners retained the rights to five-eighths of all production realized from the property and Neyer and Andres were to receive three-eighths of the production.

Neyer and Andres were obliged to drill and complete all wells at their own risk and expense but petitioners were obliged to pay their five-eighths share of operating such wells after completion.

Neyer and Andres were obliged to carry workmen's compensation insurance as required by the laws of the State of Michigan and public

liability and property damage insurance with respect to the premises covered by the agreement and they were to hold petitioners harmless from all claims, demands, and causes of action arising directly or indirectly out of their operations on the premises.

The agreement also stated that "no mining partnership or joint undertaking shall be considered as created" between petitioners and Neyer and Andres by reason of the latter's operations.

On the same day that petitioners signed the oil and gas drilling agreement and in conjunction therewith the petitioners received $50,000 from Andres.

In 1964, eminent domain proceedings were brought by Michigan Consolidated Gas Co., hereinafter sometimes called Consolidated, against the land owned by petitioners and covered by the oil and gas drilling agreement whereby Consolidated took over the use of the property as an underground storage facility for gas.

Pursuant to a condemnation order issued by the Probate Court for St. Clair County, Mich., Consolidated was given the right to occupy the land of the petitioners as of July 6, 1965.

During the period from 1964 until July 6, 1965, 854,427,000 cubic feet of gas was withdrawn from the property by Consolidated.

Consolidated was paying $0.3136 per 1,000 cubic feet of gas during the period of 1964 and 1965.

The total value of the production of gas from 1964 until July 6, 1965, was $271,084.31 and petitioners were to receive five-eighths of this amount, or $169,427.69.

The value of the petitioners' share in the production of gas as determined by Consolidated was $159,719.29.[1]

During 1964 and 1965, Consolidated took gas from Jahn No. 1 and Jahn No. 3 wells and paid for a portion of it to Neyer and Andres, owners of a three-eighths interest, and impounded the balance of money due to petitioners. The balance of the money involved was impounded because petitioner had not signed a division order agreeing to the division of the interest in the gas involved.

On May 6, 1966, a settlement was finalized between petitioners and Consolidated whereby petitioners received $935,000 in settlement of their claims against Consolidated.

On May 19, 1966, petitioners and Consolidated executed a closing statement with respect to the "Sale of Properties and Interests, Belle River Mills Field" in which the "contract price" was set forth as $935,-000. This closing agreement stated, in part, that:

Purchase price includes payment for all production from the Jahn #1 well located in the SE/4, NE/4, NW/4, Section 11, T4N, R16E, China Township, St.

---

[1] This amount appears in respondent's Exhibit H and is 34 cents larger than the figure used in his notice of deficiency. No explanation of the difference is in the record.

Clair County, Michigan and the Jahn #3 well located in the SW/4, NW/4, NE/4, Section 11, T4N, R16E, China Township, St. Clair County, Michigan, from and after the respective dates of initial production therefrom.

By the execution hereof and in consideration of said purchase price, Sellers, for themselves, their heirs, personal representatives and assigns, remise, release and forever discharge Buyer, its successors and assigns, of and from any and all claims for damages, compensation or otherwise, relating to the Belle River Mills Field located in China Township, St. Clair County, Michigan, including but not limited to any and all claims growing out of or resulting from the production, purchase, processing, storage or transmission of gas in or from said Field.

### ULTIMATE FINDINGS OF FACT

The $50,000 payment received by petitioners was an inducement in the form of a bonus or advance royalty for entering into the oil and gas lease under which the petitioners retained an economic interest in the oil and gas production and, accordingly, was ordinary income to the petitioners in 1964.

As part of the settlement with Michigan Consolidated Gas Co., the petitioners received at least $159,718.95 as their share of production for the period from 1964 through July 6, 1965, and such sum was ordinary income to the petitioners in the taxable year 1966.

### OPINION

### *Issue 1. $50,000 Bonus or Advance Royalty*

Respondent determined that the $50,000 payment which petitioners received during the taxable year 1964 upon executing an oil and gas drilling agreement was a bonus or advance royalty and hence ordinary income to them, subject to depletion during that year. Petitioners, in opposition, contend that the payment in dispute was the proceeds of the outright sale of a capital asset which was subject to preferential capital gain treatment as reported by them.

In our opinion, the transaction under consideration is an example of the classical form of oil and gas lease and for purposes of the Federal income tax is not a sale or conveyance of a property interest giving rise to capital gain or loss, and this, irrespective of the laws of the various States. *Burnet* v. *Harmel*, 287 U.S. 103 (1932). Under such an oil and gas lease, the cash and other consideration paid the lessor upon execution of the lease and before actual production is treated as an advance royalty or bonus and is ordinary income subject to percentage depletion in the year received. *Herring* v. *Commissioner*, 293 U.S. 322, 324 (1934).

Ordinarily a gas and oil transaction involves the owner of land leasing to another the right to explore and drill for oil, if found, on the property. The owner-lessor of the land retains a right to a portion of

any resulting production and "The payment of an initial bonus [or advance royalty] alters the character of the transaction no more than an unusually large rental for the first year alters the character of any other lease." *Burnet* v. *Harmel, supra* at 106.[2] The two factors of having an investment interest in the oil in place, together with the right to income from the extraction of oil or gas, is what is referred to as having an "economic interest" in the oil and gas. *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308 (1956).

In numerous cases, the granting clause under the agreement for exploration and drilling of oil and gas is written in language which normally, if standing alone, denotes a sale. Where, however, other language in the agreement reserves the right to share in production to the owner of the land, the agreement is in reality a lease. *Hogan* v. *Commissioner*, 141 F. 2d 92, 94 (C.A. 5, 1944), certiorari denied 323 U.S. 710 (1944); *Harry Leland Barnsley*, 31 T.C. 1260, 1262 (1959). The treatment of payment under an oil lease depends on who has a capital investment in the oil and gas in place and to what extent he has an interest. *Anderson* v. *Helvering*, 310 U.S. 404 (1940). Cash payments made to the owner of land for which the owner gives to another the right to explore the property in search for minerals with the owner retaining the right to a portion of any mineral production are called bonuses or advance royalties, *Bennett* v. *Scofield*, 170 F. 2d 887 (C.A. 5, 1948), and are treated as being the receipt of ordinary income subject to the right of depletion. *Palmer* v. *Bender*, 287 U.S. 551 (1933). The bonus or advance royalty is paid by the lessee and retained by the lessor, regardless of whether oil or gas or other mineral is found. *Anderson* v. *Helvering, supra* at 409.

The determination of the question whether an agreement is a lease or a sales contract is controlled neither by the formalities nor the terminology used. It is necessary to look through form to the substance and consider the transaction as a whole. *West* v. *Commissioner*, 150 F. 2d 723, 725 (C.A. 5, 1945), affirming 3 T.C. 431 (1944); *Truman Bowen*, 12 T.C. 446 (1949).

In the instant case the petitioners contend that the $50,000 payment was the consideration for the sale of the three-eighths interest of all

---

[2] The Supreme Court in dealing with the question of capital gain from the sale or exchange of a capital asset stated:

"Moreover, the statute speaks of a 'sale,' and these leases would not generally be described as a 'sale' of the mineral content of the soil, using the term either in its technical sense or as it is commonly understood. Nor would the payments made by lessee to lessor generally be denominated the purchase price of the oil and gas. By virtue of the lease, the lessee acquires the privilege of exploiting the land for the production of oil and gas for a prescribed period; he may explore, drill, and produce oil and gas if found. Such operations with respect to a mine have been said to resemble a manufacturing business carried on by the use of the soil, to which the passing of title of the minerals is but an incident, rather than a sale of the land or of any interest in it or in its mineral content. * * *" [287 U.S. at 107.]

of the mineral content lying beneath their farm to Neyer and Andres rather than a bonus or advance royalty under a lease, as respondent urges. The presence here of so many of the material provisions normally occurring in the usual oil and gas lease supports respondent's contention. The agreement, and particularly the granting clause, does not embody the language normally used in a sales transaction. If the parties had intended a sale of three-eighths of the oil and gas in place to Neyer and Andres, we think appropriate language to that effect would have been used. *West* v. *Commissioner*, *supra*. As we see it, the agreement gave Neyer and Andres the "right" to drill and explore for and produce oil and gas; required that they in fact commence drilling within 10 days after a permit was obtained from the State of Michigan; and obliged them to operate or arrange for operation of the wells. Also Neyer and Andres were obliged to take out insurance in order to save petitioners harmless from possible lawsuits with respect to the projected operations, a requirement which is more often embodied in a lease. Notably the parties specified that they were not engaged in a joint venture by reason of the operations. The fair import of these provisions read together is that no real change in ownership of the land involved was contemplated.

Viewing the transaction in question in its entirety, we conclude that the parties intended to undertake a lessor-lessee relationship and that the agreement involved herein was actually an oil and gas lease, and that Neyer and Andres gave the petitioners a bonus or advance royalty to induce them to enter into the lease. The petitioners maintained an economic interest in the gas in place by retaining a five-eighths share in the production to be realized from the operation of the wells. Accordingly, we hold that the payment in question was not the proceeds of a sale but was the receipt of ordinary income to the petitioners in the taxable year 1964. See *Estate of Budd Frankenfield*, 17 T.C. 1304, 1316 (1952).

### Issue 2. $159,718.95 Production or Royalty Payments in 1966

Respondent determined that the amount of $159,718.95 of the $935,000 received by petitioners in 1966 as part of a settlement in that year of their claims against Michigan Consolidated Gas Co. was includable in their income as a production payment to them and therefore was taxable as ordinary income, subject to depletion, during that year. Petitioners, in their petition, contend that the entire $935,000 contract or selling price is the proper amount for determining the capital gain realized on the sale of their mineral rights in 1966. It is petitioners' position that they were not entitled to any production income because their interest was terminated by the condemnation

proceedings and the only factor that was undetermined by Consolidated was the fair market value of the property condemned, which was evaluated to be $935,000.[3]

Respondent's determination is presumptively correct and petitioners have the burden to demonstrate error therein. For reasons hereinafter discussed, we do not believe that petitioners have met their burden.

The evidence shows that in 1964 several gas wells were completed and Consolidated commenced production of gas. During 1964 and 1965, Consolidated paid for a portion of the gas taken from Jahn No. 1 and Jahn No. 3 wells to Neyer and Andres, owners of the three-eighths interest and impounded the balance of the money due to petitioners because petitioners refused to sign a document agreeing to the division of interest in the gas involved. On July 6, 1965, pursuant to an order of condemnation, Consolidated took possession of the wells and all gas remaining in place. Until that date the petitioners had a five-eighths interest in all gas production from the property, including the impounded funds. In 1966 a settlement was reached whereby the petitioners received $935,000 in full settlement of their claims against Consolidated. The settlement encompassed all claims the petitioners had for gas produced from the property. Petitioners reported the entire $935,000 as being proceeds from the sale of a capital asset held for more than 6 months.

In the absence of affirmative evidence to the contrary, we are persuaded that gas was produced from petitioners' property during the period prior to July 6, 1965. An official of Consolidated who was involved in the negotiations surrounding the settlement finally reached between the parties testified as to the amount of production prior to July 6, 1965, and its value. Petitioners' only response to this testimony was that they were unaware of the production of gas during this period except for limited testing of the wells, even though they lived 935 feet from one of the wells. Analysis of the settlement agreement shows that the parties specified that the payment to the petitioners included the amount due them for "all the gas production" from the property. This production, in our opinion, included the money due to petitioners which Consolidated had impounded because petitioners refused to sign the division order. Consolidated valued the petitioners' share of the gas production for the period from 1964 to July 6, 1965, to be $159,718.95.

Considering the record as a whole, we are convinced that petitioners reached a settlement with Consolidated as to the value of the assets taken from them by Consolidated and such settlement included the

---

[3] Petitioners did not file any brief herein and, except for their views expressed in the petition and at the trial, we do not know their present position.

impounded payment for production of gas from petitioners' property prior to July 6, 1965. Petitioners received at least $159,718.95 in production payments during 1966, and such payments were ordinary income to petitioners in that year. Sec. 1.61–8, Income Tax Regs.[4] See *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958).

*Decision will be entered for the respondent.*

---

[4] Sec. 1.61–8. Rents and royalties.

(a) *In general.* Gross income includes rentals received or accrued for the occupancy of real estate or the use of personal property. For the inclusion of rents in income for the purpose of the retirement income credit, see section 37 and the regulations thereunder. Gross income includes royalties. Royalties may be received from books, stories, plays, copyrights, trademarks, formulas, patents, and from the exploitation of natural resources, such as coal, gas, oil, copper, or timber. * * *