The G. W. Van Keppel Company v. Commissioner.
G. W. Van Keppel Co. v. Commissioner
Docket No. 80106.
United States Tax Court
T.C. Memo 1960-224; 1960 Tax Ct. Memo LEXIS 67; 19 T.C.M. (CCH) 1253; T.C.M. (RIA) 60224; October 20, 1960
Albert F. Hillix, Esq., and Richard H. Brown, Esq., for the petitioner. Claude R. Sanders, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income taxes of the petitioner for the years ended November 30, 1955 and November 30, 1956 in the amounts of $5,119.69 and $5,589.06 respectively. The sole issue to be resolved is whether capital improvements by the petitioner upon leased property should be amortized over the stated period of the lease or depreciated over the estimated useful life of the improvements. Findings of Fact Petitioner is a *68 corporation organized and existing under the laws of the State of Missouri. It is engaged in the sale and servicing of heavy construction equipment, with its principal offices located at 2461 Pennway, Kansas City, Missouri. Petitioner filed its corporate income tax returns, Form 1120, for the taxable years ended November 30, 1955 and November 30, 1956 with the district director of internal revenue, Kansas City, Missouri. The petitioner was incorporated on December 29, 1945. The business had previously been operated by G. W. Van Keppel as a sole proprietorship. The stock of the corporation consisted of 1,500 shares of common which were issued on December 31, 1945 to the following persons: Name of Stockholder
No. of Shares
G. W. Van Keppel
1,124
Elizabeth E. Van Keppel
375
Ralph L. Mitchell
1
1,500 G. W. Van Keppel and Elizabeth E. Van Keppel are husband and wife. Named as the petitioner's directors and officers on or about the date of incorporation were the following: Directors
G. W. Van Keppel
Elizabeth E. Van Keppel
R. L. Mitchell
Officers
Title
G. W. Van Keppel
President and Treasurer
R. L. Mitchell
Vice President
K. W. Cramp
Secretary
*69 On June 30, 1945, a lease was executed by and between Elizabeth E. Van Keppel, lessor, and G. W. Van Keppel, lessee. This lease, herein referred to as the 1945 lease, provided that the term would be 10 years, beginning July 1, 1945, and ending June 30, 1955, and that the lessee would pay a total rent of $18,000 payable at the rate of $150 per month in advance. The caption premises of this lease were lots 16, 17, 18, 19, 20, 21, 22, 23 and 24 in Block G, and lots 9, 10 and 11 in Block E of Jameson's subdivision in Kansas City, Jackson County, Missouri. It also contained the usual lease covenants. The subject matter of this lease was acquired through periodic purchases as follows: Date
Purchaser
Lot
Block
Price
2-13-38
G. W. and Eliza-
beth E. Van
Keppel
16
G
$ 680
17
G
2,000
18
G
1,800
19-20
G
2,500
10-25-44
Elizabeth E. Van
Keppel
21
G
1,500
10-26-44
22
G
1,500
10-28-44
23
G
1,500
2- 3-45
24
G
1,500
4- 5-45
10-11
E
1,500
6-22-45
9
E
1,500
$15,980 The part of the property which was acquired jointly by G. W. and Elizabeth E. Van Keppel was conveyed through straw parties to Elizabeth *70 E. Van Keppel on June 30, 1945. The 1945 lease was assigned on the date of the incorporation, December 29, 1945, to the petitioner which was accepted as the assignee by the lessor, Elizabeth E. Van Keppel. The lease remained in effect until September 30, 1950 when by mutual agreement of the parties it was cancelled. A special meeting of the Board of Directors of petitioner was held on August 18, 1950. The minutes of those proceedings show: On motion duly made, seconded and unanimously carried, G. W. Van Keppel was authorized to negotiate a lease agreement for a period of ten (10) years on the following described property: All of Lots 19 and 20 in Block "F"; all of Lots 16 to 24 inclusive in Block "G"; and the West 15 feet of Lot 6 and all of Lots 7 to 11 inclusive in Block "E", all in Jameson's Sub-division, Kansas City, Jackson County, Mo.
The rental of such property, for the specified term, shall be at the monthly rate of $250.00, payable at the first of each month. The Corporation is to assume and pay all taxes due and accruing for the term of the lease. The Board also authorized G. W. Van Keppel to negotiate for the construction of a building of proper size and design, *71 to be erected on the Northeast corner of 25th Street and Pennway, at a cost not to exceed $100,000.00. In accord with the Board of Directors' authorization a lease, herein referred to as the 1950 lease, was executed on September 28, 1950, by and between Elizabeth E. Van Keppel, lessor, and petitioner, lessee. The pertinent provisions of this lease state that the lease was to be of a 10-year duration commencing October 1, 1950, and ending September 30, 1960, and the lessee was to pay a total rent of $30,000 at a rate of $250 per month in advance. The leasehold includes all the property under the 1945 lease, as well as the west 15 feet of lot 6 and all of lots 7 and 8 of Block E and lots 19 and 20 in Block F in Jameson's subdivision. This lease also contained the usual covenants. The additional realty contained in the 1950 lease was acquired by Elizabeth Van Keppel, as follows: Date
Lot
Block
Cost
6-10-50
W 15 Ft of 6 and all of
7 and 8
E
$ 9,500
9-20-50
20
F
1,500
9-22-50
19
F
1,500
$12,500
Lots Previously Acquired
15,980
Total Cost of Leased Property
$28,480
On the date of the execution of the 1950 lease, the issued *72 and outstanding stock of the petitioner was held by the following persons: Name of Shareholder
No. of Shares
G. W. Van Keppel
984
Elizabeth E. Van Keppel
375
James V. Troutz
50
Martin L. Davis
50
K. W. Cramp, Sr.
25
L. A. Henkebein
10
J. H. Malone
5
Treasury
1
1,500
On such date the directors and officers of the petitioner were the following persons: Directors
G. W. Van Keppel, * Elizabeth E. Van Keppel, K. W. Cramp Officers
Title
G. W. Van Keppel
President and Treasurer
J. V. Troutz
Vice President
Martin L. Davis
Vice President
K. W. Cramp
Secretary
The property which is the subject of the 1950 lease, is centrally situated, being one and one-half miles from the business district of Kansas City, Missouri, in an area occupied by companies engaged in light and heavy industrial operations. This central location affords the petitioner easy access to all parts of the city, and convenience in selling and servicing its customers. The property is also situated along the right-of-way of the Kansas CityTerminal Railway Company, two blocks from the city's railway station. *73 When operated by G. W. Van Keppel as a sole proprietorship the business was located for many years across the street. Pursuant to the authorization of the Board of Directors, a building of proper size and design was erected at a cost of $98,180.57. The building is of one-story construction and contains a combination office, showroom and warehouse. The total area is 12,500 square feet. It is of concrete and brick construction with a tar and gravel roof and has plate glass show windows, concrete bulkheads, pedestrian entrances, and a loading dock. The interior walls are plastered and painted, the ceiling is of acoustical tile, and the floor is concrete covered with asphalt tile. The building is serviced by a gas-fired furnace and is particularly adapted to the petitioner's business. It is in good condition. In addition to the building, improvements on the property also include: (1) One-story metal paint shop constructed in 1935 having an area of 979 square feet. (2) A yard loading dock constructed in 1935. (3) One-story concrete block garage containing 1,530 square feet erected in 1946. (4) An addition between the garage and paint shop of one-story which fuses the three *74 into a single unit. This addition was constructed in 1950 and contains 388 square feet. Other improvements subsequent to the completion of the office building are as indicated: Improvement
Date
Cost
Office Building
2-25-52
$ 250.00
Sign
8-29-52
1,760.90
Office Building
12- 1-52
40.00
Air Conditioning
8- 7-53
2,608.14
Partitions
10-22-53
2,315.00
Air Conditioning
11- 4-53
100.00
Air Conditioning
11-12-53
1,863.65
Air Conditioning
11-25-53
3,553.91
Partitions
11-21-55
144.00
Retaining Wall
7- 1-56
13,879.77
$26,515.37
The unimproved areas on the premises are used either as driveways or for storage of equipment. The driveways are paved, while the remaining portion is a hard surface composition of cinders and gravel. In addition to the property described in the lease, the petitioner has for many years utilized land under the West Pennway Viaduct. This provides the petitioner with an additional 4,200 square feet under roof and is used to store large quantities of materials and to park vehicles. The following is a schedule of the expenditures for taxes, insurance and repairs accrued by the petitioner in each of the years ended *75 November 30, 1951 through November 30, 1956, with reference to the improvements. 1951
1952
1953
1954
1955
1956
Real Estate Taxes
$1,219.93
$2,822.50
$2,882.51
$2,955.10
$3,031.90
$3,146.54
Insurance
186.23
256.47
256.47
275.28
369.28
369.28
Repairs
0
0
547.86
55.00
0
1,051.34
Total
$1,406.16
$3,078.97
$3,626.84
$3,285.38
$3,401.18
$4,567.16
On November 30, 1956, the end of the second fiscal year under consideration, the issued and outstanding stock of the petitioner was owned by the following persons: Number
Name of Shareholder
of Shares
G. W. Van Keppel
774
J. V. Troutz
150
M. L. Davis
150
L. A. Henkebein
15
A. E. Falk
10
P. J. Kelly
10
J. H. Malone
7
H. C. McKeehler
5
O. A. Duncan
2
J. L. Butler
1
Treasury
1
1,125 *
On November 30, 1956, the following persons were the petitioner's directors and officers: Directors
G. W. Van Keppel, * J. R. Van Keppel, J. V. Troutz, M. L. Davis, T. E. Walker *76 Officers
Title
G. W. Van Keppel
President and Treasurer
J. V. Troutz
Executive Vice President
M. L. Davis
Vice President
O. A. Duncan
Secretary
On its returns for the taxable years ended in 1955 and 1956, petitioner reported amortization of the improvements in the respective amounts of $12,267.10 and $13,377.62. The petitioner computed these deductions by amortizing the improvements over the unexpired term of the lease remaining after the completion of their construction. The respondent determined that the improvements should not be amortized over the unexpired term of the lease but rather depreciated over their estimated useful life, and reduced the deductions for the taxable years ended in 1955 and 1956 in the respective amounts of $9,845.56 and $10,748.20. At the end of the taxable years it was reasonably certain that the petitioner would continue in occupancy of the premises beyond the term of the lease. Opinion The issue to be resolved is whether the petitioner may amortize the cost of the improvements which it made to the leasehold over the remaining term of the lease or must depreciate them over their estimated useful life. The rule is set *77 out in section 1.162-11(b)(1) of the Regulations under section 162, Internal Revenue Code of 1954, as follows: "The cost to a lessee of erecting buildings or making permanent improvements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. If the estimated useful life in the hands of the taxpayer of the building erected or of the improvements made, determined without regard to the terms of the lease, is longer than the remaining period of the lease, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining in the term of the lease, and such deduction shall be in lieu of a deduction for depreciation. If, on the other hand, the useful life of such buildings or improvements in the hands of the taxpayer is equal to or shorter than the remaining period of the lease, this deduction shall be computed under the provisions of section 167 (relating to depreciation). Where there is a possibility that the lease may be renewed, the matter of spreading such costs over the term of the original lease, together with the renewal period *78 or periods, depends upon the facts in the particular case, including the presence or absence of an option of renewal and the relationship between the parties. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease, or the cost of improvements shall be spread only over the number of years the lease has to run without taking into account any right of renewal." *
It has been held under this regulation that when the facts show that there is a reasonable certainty that the tenant will continue in occupancy beyond the stated period of the lease, the lessee is a tenant for an indefinite duration and the improvements should be depreciated over their estimated useful life. Standard Tube Co., 6 T.C. 950 (1946); Kerr-Cochran, Inc., 30 T.C. 69; Highland Hills Swimming Club, Inc. v. Wiseman, 272 F.2d 176 (C.A. 10, 1959). We find that this *79 exception is applicable here. There are many factors tending to show a reasonable certainty that the petitioner will remain upon the premises beyond the termination of the lease. The leasehold is situated in a centralized location convenient to the petitioner's customers, the improvements are of substantial cost in relationship to the cost of the land and have been tailor-made to the petitioner's specifications and the petitioner has the use of land under an adjoining viaduct for storage purposes and a railroad spur which the petitioner utilizes in its business. This is further verified by the testimony of a real estate broker and appraiser introduced by the petitioner. As conclusions from an appraisal made in April 1960 he testified that "the present use of the property constituted the highest and best use thereof" and that due to the nature of the improvements they have "limited functional utility for any other tenant with the exception of the present tenant." The petitioner contends that even though it may remain upon the premises beyond the stated period of the lease, it would do so, not under the same terms as the 1950 lease but under a new lease whose terms would reflect *80 the appreciated value of the property, and that a new rental basis which includes the petitioner's improvements results in a loss of the improvements in the same manner as if it had vacated the premises, and therefore to recover the amounts expended it should be permitted to amortize these improvements over the term of the 1950 lease. A similar argument was rejected in Hens & Kelly, Inc., 19 T.C. 305 (1952), in which we held that improvements to a leasehold were required to be amortized over the term of the original lease together with the renewal period when it was found that it was reasonably certain that the lease would be renewed even though the renewal was to be based upon a reappraisal of the property for ascertaining the rental for the renewal period. Although in Hens & Kelly, Inc. there was a renewal clause while here there is none, such a clause is not persuasive when we consider that the lessor was the wife of the principal stockholder of petitioner, a factor which did not exist in Hens & Kelly, Inc. To mitigate this relationship factor the petitioner calls attention to our holding in Jos. N. Neel Co., 22 T.C. 1083 (1954), in which we said *81 that While the actions of a family corporation or family group should be carefully scrutinized, it is entirely conceivable that the relations each with the other, or their respective personalities, may be such that they will deal with each other strictly at arm's length. In fact, it sometimes happens that their very nearness in blood leads them to be more independent in action than strangers in blood. We are constrained to hold upon the present record that the aggregate payment called for in petitioner's lease with its related lessor is fair and reasonable and had the same result as arm's-length negotiations between strangers. Our holding in the Neel case is distinguishable. In that case the lessors and lessees were brothers and sisters each having a completely independent pecuniary interest. Also, in that case the lease was drawn by an independent third party. Contrasting those facts with this situation we find no separate interests but rather an identity of purpose and intent between the lessor and lessee. This unity of interest can be best exemplified by a review of past dealings between the parties. The 1945 lease also did not contain a renewal clause but the history of that *82 lease shows it was cancelled in 1950 with five years of its term remaining. The 1950 lease was formulated at a meeting of the Board of Directors of the petitioner, at which meeting G. W. Van Keppel was authorized to execute a lease for 10 years at $3,000 per year. The lessor, Elizabeth E. Van Keppel, was at that time a director as well as a stockholder of the petitioner and completely acquiesced in these plans rendering the subsequent execution of the lease a mere formality. In analyzing these transactions "We must look not only to the language employed in [the] instruments, but to the circumstances surrounding the parties when the instruments were executed" West v. Commissioner, 150 F. 2d 723 (C.A. 5, 1945). Also see Wichita Terminal Elevator Co. v. Commissioner, 162 F.2d 513 (C.A. 10, 1947). At the time of the execution of the 1950 lease Elizabeth Van Keppel, lessor, and her husband, G. W. Van Keppel, president of the lessee, controlled over 90 per cent of the stock of the petitioner. It is true that Elizabeth E. Van Keppel is no longer a director nor does she hold a stock interest in the petitioner. However, these facts have no force in establishing *83 that her interests are now entirely separate from those of the petitioner, as her husband, G. W. Van Keppel, and her son, J. R. Van Keppel, are presently directors and G. W. Van Keppel still holds a majority of the stock and is a guiding force in the policies of the petitioner. Arranging the transaction in this form is apparently designed to be of advantage to the petitioner. By so doing it hopes to secure a quick amortization of the improvements as well as a visible basis to justify its not distributing a significant proportion of its earnings as dividends. No problem arises at the termination of the lease period as the relationship of the parties practically guarantees the petitioner a continued occupancy as long as it is advantageous from a business point of view. Other advantages to the parties can be demonstrated when the contention of the petitioner relating to the execution of a new lease between the parties is closely examined. At the termination of the 1950 lease the lessor will own a valuable building and other improvements which will greatly enhance the value of the premises. Such an increase in land value would justify an increase in rent. The petitioner would then *84 be able to pay large amounts to the wife of its principal stockholder and deduct them as rental payments, the increase in the rental payments being directly attributable to improvements that the petitioner had constructed upon the leasehold. The arrangement of a lease with no renewal clause and a rent that appears reasonable under the circumstances presents an attractive device from a tax standpoint when the lessor and lessee are closely related persons as in this situation. However, when all the surrounding circumstances which shed light upon the true nature of the transaction are viewed, it can be seen that in substance the transaction was so arranged in order to obtain a tax advantage and is not to be construed as an arm's-length contract. The Supreme Court in Commissioner v. Court Holding Co., 324 U.S. 331, held that it would not "permit the true nature of a transaction to be disguised by mere formalisms, * * *." See also Higgins v. Smith, 308 U.S. 473. The petitioner having intended ab initio to occupy the premises for a continuous duration beyond the stated period of the lease, the improvements should have been depreciated over their estimated useful *85 life. Decision will be entered for the respondent. Footnotes
*. Ceased to be a director on January 15, 1951.↩
*. The remaining 375 shares originally issued were cancelled and the authorized shares reduced by 375 on November 29, 1956.↩
*. Son of G. W. and Elizabeth E. Van Keppel↩
*. The 1939 Code regulation originally quoted in the opinion was deleted, and the applicable 1954 regulation inserted. Amendment was by a court order signed by Judge Tietjens↩ and dated November 21, 1960.